## THE DELAWARE.

*(District Court, S. D. New York.  May 9, 1882.)*

1. COLLISION—DUTY OF TUG AS TO SAFETY OF TOW.
     Though a vessel be anchored at an improper place, a steam-tug, with a long tow upon a hawser astern, is not justified in passing her and entering a strong current, which is obviously likely to swing the tow against the vessel at anchor, if there be any other less dangerous alternative.  It is the paramount duty of a tug to consult the safety of her tow, and to run no avoidable risk.

2. ANCHORING IN WRONG PLACE—NOT TO EXCUSE NEGLIGENCE IN STEAMER PASSING.
     Where the steamer C. came to anchor from 1,000 to 1,500 feet to the westward of Governor's Island, at the mouth of the East river, when, as contended by the claimant, she was 600 to 700 feet off the port quarter of the steam-tug D., having in tow, upon a hawser 390 feet long, six tiers of canal-boats, and the tide from the East river was at the strength of the ebb, and the danger of the tow's swinging against the steamer was perceived in case the steam-tug should proceed to cross the strong ebb tide, and there being no other reason for not dropping astern than the fear that the hawsers might foul, and the steam-tug D. having three smaller tugs as helpers at her command, but the steam-tug nevertheless proceeded to cross the strong current of the ebb tide under a hard a-port wheel, but was unable in so doing to prevent the libellant's boat in the fourth tier from swinging against the steamer, whereby it was sunk, *held*, that the excuse given was insufficient; that the tow might and should have been taken astern; and that the steam-tug was answerable for the loss.  *Held, also,* that it was the duty of the steam-tug, if it was believed that the steamer C. had come to anchor at an improper and dangerous place, her steam being still up, to give danger signals before going on, in order that the steamer might be notified to change her position, there being sufficient time to do so.

*Benedict, Taft & Benedict* and *S. H. Valentine,* for libellant.

*Beebe, Wilcox & Hobbs,* for claimant.

BROWN, D. J.   The libel in this case was filed by the owner of the canal-boat Cecilia, to recover damages for the sinking of his boat by a collision in the afternoon of July 13, 1877, with the Spanish steamer Carolina, lying at anchor off Governor's island, at the mouth of the East river.

The Cecilia was one of a tow of 28 canal-boats in charge of the steam-tug Delaware, a powerful tug of 180 feet in length, bound from New Brunswick to the Stakes above Jersey City, by way of the Kilns and the upper bay.   The tow consisted of five tiers of boats, having five boats in each tier, and a sixth tier of three boats, all lashed together, and drawn by the Delaware upon hawsers 390 feet long. The entire length covered by tug and tow was about 1,180 feet.   The Cecilia was the outer boat upon the port side in the fourth tier.   The arrival of such tows is usually timed so as to cross the mouth of the

East river at the last of the flood. On this trip the Delaware was belated, so that the ebb-tide from the East river, which is considerably earlier than the ebb from the North river, and which sets diagonally across towards the Jersey flats in a southwesterly direction, was already at its full strength. As is usual in such cases, the tug and tow came up in the slack-water along the west side of Governor's island, and the tow, which was nearly 100 feet wide, passed about 300 feet to the west of Castle William. As they entered the strong current of the ebb tide immediately after passing the fort, the tow was swung around to the westward, and the libellant's boat was carried with such force against the stem of the steamer Carolina as to cause his boat to sink almost immediately.

The Carolina lay at anchor from 1,000 to 1,500 feet off the fort, on the line of Ellis' island, or perhaps a little above that line. All of the libellant's witnesses testify that the Carolina had come to anchor from a quarter to half an hour before the Delaware had reached her. Several of these witnesses were disinterested, competent, and in a situation to observe carefully; especially the witness Brainard, who testified that he passed the Carolina with his tug as he went down to the tow from Jersey City, and that she had already anchored some time before the Delaware reached her. Unless these witnesses are wholly mistaken, it is clear that the Delaware was in fault for undertaking to go between the fort and the steamer without such arrangements as would make sure of keeping the tow from swinging against the steamer.

Numerous witnesses on the part of the claimant, however, testify that the Carolina came up astern of the tow, and upon the west or port side, but at no time passed the Delaware; and that she dropped her anchor unexpectedly and without warning, when her bows had lapped the Delaware's port quarter about up to her wheel-house, at a distance from her of about 600 feet to the westward, as the captain estimates, or about 700 feet, according to the pilot. The particularity with which the testimony on this subject is given by the different witnesses makes it difficult to reject the testimony on either side. I can perceive no way of reconciling them except upon the supposition that the different witnesses are referring to two different steamers, which seems to be rendered the more probable from the testimony near the close of the case, from which it appeared that the hull of the Carolina was red, while another steamer, somewhat astern, and 500 or 600 feet further to the westward of the Carolina, had a black hull with a red streak near the water's edge. A number of witnesses

testify to this second steamer being thus anchored a little astern and to the westward of the Carolina, while others did not notice more than one; and some of the witnesses, who speak of seeing but a single steamer, described her as having a red hull, while others speak of her as having a red stripe only.

Assuming, however, the account of the matter as given by the witnesses on the part of the claimant to be true, I am, nevertheless, not satisfied, after a careful consideration of the testimony, that the Delaware, and those in charge of the tow, performed their whole duty as careful and prudent navigators, so as to exempt the Delaware from liability.

The pilot states that when he saw the anchor dropped by the Carolina he thought there might be a collision. From that moment, therefore, whether the Carolina was justified in anchoring as she did, and in the place where she did, or not, the paramount duty of the Delaware was to secure the safety of her tow, by any and every means in her power, and to run no avoidable risk; nor could she, except at her own peril and risk for any injury that might ensue, proceed against the strong ebb-tide with the certain and obvious danger of the tow's being swung against the steamer at anchor, unless there were no other alternative involving less obvious danger. *The Jessie Russell*, 5 FED. REP. 639; *The Brooklyn*, 2 Ben. 547, 552–3; *The Baltic*, Id. 452; *The Lady Franklin*, 2 Low. 220. The fault of the Carolina, if fault there was, would not in such a case be any defence to the Delaware, if the latter had still left any practicable means of avoiding the peril. *The Atlas*, 93 U. S. 302; *The Juniata*, Id. 337.

I am satisfied from the evidence that the Delaware was not, in this case, precluded from any other alternative than going on at the evident risk of the tow's colliding with the Carolina; but that she might and should, as the most prudent course, have permitted her tow to drop astern; and that with the help at the command of the Delaware, and in the circumstances and positions of the vessels, there was nothing to prevent this being safely done. The Carolina was some 600 or 700 feet distant to westward from the Delaware, and lapped her nearly half her length. The other steamer was but little astern of the Carolina, and 400 or 500 feet further to westward. The Delaware had not ported her wheel at this time, but was heading for the battery, and her helm was not ported so as to turn eastward against the ebb-tide, as the libel alleges, and as the captain and pilot both testify, until the Carolina was thus seen to drop her anchor. The hawser was 390 feet long; so that the head tier of the tow had not reached

the Carolina at that time, and had plenty of space to keep clear of both of the two steamers at anchor had the Delaware stopped and allowed the tow to drop astern. The only reason assigned by the pilot for not stopping was that the hawser might thereby have fouled. There were at the time two other small tugs, one on each side of the hawser tier of the tow, as well as the Jessie, a third helper, on the starboard side of the Delaware. With these helpers, which were able to maneuver quickly, I cannot believe that there would have been any difficulty in guiding the tow backwards out of any danger had the Delaware preferred not to take the risk of keeping on, notwithstanding the unexpected anchoring of the Carolina off her port quarter. From some cause not explained the Delaware was behind time, so as not to pass Governor's island and the mouth of the East river upon the last of the flood, as was intended, and as she ordinarily would have done. The Carolina may have been at fault in anchoring at the place and time she did; it was allowable for her to anchor within 1,200 feet of the fort. There was no one to represent her case upon this trial, and upon the evidence here given it is not certain that she was not that distance from the fort. But if her casting anchor at the time and place she did was an act of certain danger to the Delaware and her tow, signals might have been easily given to her from the Delaware, which was not done. Had they been given, and had the danger been obvious, it can hardly be supposed that the Carolina would have changed her position, as she had steam up, and there was sufficient time to do so before the collision occurred. *O'Neil* v. *Sears*, 2 Spr. 52; *The Petrel*, 6 McLean, 491.

It must be held, therefore, that the Delaware kept on her course voluntarily, instead of dropping astern, as she might and should have done, and that she trusted to her own ability to proceed and keep her tow clear of the steamer. She must therefore be held answerable for the result. *The Scots Greys*, 5 Fed. Rep. 369.

One of the helpers, after considerable delay, proceeded, though too late, to the port side of the tow to assist in shoving it more to starboard. No reason appears why this was not done earlier.

On the whole, as the libellant's boat was free from blame and completely subject to the navigation of the Delaware, I think the latter must be held answerable for the loss.

The libellant should have judgment, with costs, with a reference to compute the damages.