THE BEE.

THE ALFRED W. BOOTH.

(Circuit Court of Appeals, Second Circuit. April 13, 1905.)

Nos. 184, 185.

1. COLLISION—TUGS AND TOWS MEETING—FAILURE TO ALLOW SUFFICIENT CLEARANCE FOR TOWS.

Under the rule that tugs with scows, having neither steering gear nor men to operate them, in tow on long hawsers, are bound to exercise the extremest care to prevent collisions with their tows, two tugs meeting in New York Bay, each with two scows in tow tandem, both *held* in fault

for a collision between the tows for failing to change their courses sufficiently to allow a safe clearance, and one also for straightening out on her course before the tows had passed.

2. SAME—NAVIGATION OF CHANNELS—APPLICATION OF RULE TO UPPER NEW YORK BAY.

In the case of a bay which is also a port or harbor, the entire body of navigable water is not to be considered a single narrow channel within article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), requiring a steam vessel, when safe and practicable, to keep to that side of the fairway which lies on its starboard side, where through such bay, as in upper New York Bay, there have been officially designated two or more channels running substantially parallel with each and in the same general direction as the main flow of the tide or current.

Appeals from the District Court of the United States for the Southern District of New York.

These two causes were heard together. They arose out of a collision between the scow Delaware, owned by the contracting company, in tow of the Booth, and the scow No. 20, in tow of the Bee, the last-named tug and tow being owned by the R. G. Packard Company. A decree was entered in the first suit in favor of the contracting company against both tugs for $1,983.66; both tugs appealed. In the second suit decree was entered in favor of No. 20 against the Booth for one-half damages, with interest and costs (to wit, $1,684.95); both sides appealed. The cause is reported below. 127 Fed. 453.

R. D. Benedict and Chas. C. Burlingham, for the Booth.

Le Roy S. Gove, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

PER CURIAM. The collision is thus described by the District Judge:

"The collision occurred off Bay Ridge, in the upper bay of New York, on September 7, 1902, about 1:30 a. m. The tug Alfred W. Booth was coming in from sea, having in tow two scows, tandem, the first one on a hawser of about 150 fathoms, and the second one, the Delaware, astern of the first scow, on another hawser of about 80 fathoms. The tug Bee was coming down the bay, having in tow two scows, one of them No. 20, also tandem, but close together, on a hawser of about 200 fathoms. Each of the tugs, when they were about half a mile apart, saw the red light of the other, and each sounded one whistle to the other, indicating an intention to pass port to port. The Bee immediately ported and changed her course about four points to starboard, and held that course unchanged until the collision. The Booth also ported two or three points, and, when about abreast of the Bee, straightened and resumed her course up the bay. The tugs passed each other in safety, but the Delaware, at the end of the Booth's tow, came in collision with the scow No. 20, the head boat in the Bee's tow. The scow No. 20 was badly injured, and the scow Delaware shortly after sank.

"In my opinion, the Booth was at fault for not continuing to bear off to starboard until the tows had entirely cleared each other. The witnesses put the distance of the tugs apart when they passed each other at about 250 or 300 feet. Each had been bearing several points to starboard of her original course for the last half mile. The evidence shows that such tows on such long hawsers do not usually follow instantly a change of course of the tug, but drift on some distance in the original direction, or with only a slight change of direction. There was danger, therefore, when the tugs passed each other but 250 feet apart, that the scows might drift together, and the Booth should have anticipated that danger and kept bearing off to starboard until it was certain that the scows would pass each other in safety.

"I do not see that the Bee was in any fault in the manner of her navigation. Her pilot changed his course, as soon as he saw the Booth, about four points to starboard, and kept that course till the collision."

What the pilot of the Bee testified was that his total change of course from the time he blew a one-whistle signal until collision was four points. The extent to which his wheel was ported was apparently not any greater than was the case on the Booth, but he did not straighten up as the latter did. The District Court held the Bee in fault for "being on the wrong side of the channel, in violation of rule 25."

Upon the narratives given by both sides, it is difficult to see how the collision happened. If the tugs passed 250 to 300 feet from each other, even if one only was under a port helm, no ordinary sheering by the tows could be expected to bring them together. We wholly discredit a statement of the pilot of the Bee that after the Booth passed him she changed her course directly for his towing hawser. We have a very strong impression that all the witnesses have greatly overstated the distance between the tugs. However that may be, there was faulty navigation somewhere; the night was clear starlight, and they sighted each other far enough apart to avoid all risk of collision of their tows if they had left sufficient clearance between themselves. Manifestly they did not, and the damages thus occasioned to innocent tows should be made good by both, unless we can see that one of them was alone to blame. In criticising their navigation, it is to be remembered that each of them was towing scows, which had neither steering gear nor men to operate it, on very long hawsers. It is the custom to tow in that way in this harbor, and in The H. M. Whitney, 86 Fed. 697, 30 C. C. A. 343, we quoted with approval the opinion of the Circuit Court of Appeals, First Circuit (The Berkshire, 74 Fed. 906, 21 C. C. A. 169) that "it is beyond the province of the courts to condemn a practice so notorious and so long continued that it must be presumed to be known to Congress and to the supervising inspectors, and yet has not been condemned by either of them." But we held that "there is a wide difference between condemning such a practice altogether, and holding those who indulge in it to a degree of care commensurate with the increased risk which their indulgence in such practice entails;" and added, "We must hold tugs which navigate with such long and essentially hazardous fleets to the use of the extremest care in the interests of common safety." Tested by this criterion of "extremest care," we find both tugs in fault for not allowing sufficient clearance—the Booth for straightening up too soon, the Bee for not putting her wheel further to port when she whistled. She had come from a stakeboat on the Jersey Flats, and crossed over to the eastward just before she straightened out on her south by west course down the bay, and had reason to apprehend that her tow had not yet overcome their set towards the eastward, and needed a sharp pull to the westward to fetch them clear of the Booth's flotilla.

This finding would result in an affirmance, and would call for no further discussion, but we have been asked to express an opinion

138 F.—20

on the decision of the District Court that the upper bay of New York is to be considered a narrow channel within rule 25—a propositon first advanced in the decision now under review. It seems proper that we should pass upon it, in the interests of navigation in this port. The District Judge in his original opinion, and in a second one filed upon a rehearing after hearing further testimony from pilots and others, has carefully discussed the question. His reference to the authorities bearing upon it is exhaustive. His final conclusion was that the question whether the entire upper bay is to be regarded as a narrow channel for vessels of light draft is doubtful, but that, upon consideration of the authorities, it should be held to be such. We do not think it necessary to discuss the authorities, none of which exactly cover the case, nor to undertake to lay down any rules of general application. It was wisely said in the Rhonda, 8 App. Cas. 552, that "their Lordships do not propose to define what is a narrow channel, or to lay down what particular width or length will constitute it." It will be sufficient briefly to indicate the reason why we cannot concur in the conclusion as to this particular locality.

The upper bay is a body of water connecting the mouths of the North and East rivers with the Narrows, or strait which connects the upper with the lower bay, and it is not wider than some waters which have been held to be narrow channels. It is a part of the harbor of New York; its surrounding shores are extensively built up, and on them are found docks, bulkheads, and other landing places. The government has made elaborate and careful special regulations as to navigation within its waters; a very large part of its area has been designated officially as anchorage grounds, some general, others special. By like authority various "channels" have been designated within such area, and special regulations as to those channels have been adopted. The exact weight to be given to any or all of these circumstances we do not now assign. We note, moreover, that, of those channels thus designated by authority and accepted by navigators, two, the "Main Ship Channel" and the "Bay Ridge Channel" (with its extension, the "Red Hook Channel"), run substantially parallel and in the same general direction between the mouths of the rivers and the Narrows. A similar state of affairs exists in the lower bay, and existed there when we decided The Sea King, 114 Fed. 535, 52 C. C. A. 349. It was held in that case that rule 25 applied to the Main Ship Channel, in which the Sea King was navigating; and the opinion indicates that the same rule would have been applied had she been navigating in either the Swash Channel or the East Channel, which run in the same general direction. Such application would seem to be in conflict with a rule which tested her proper location upon the theory that the entire body of water which includes these three channels was itself a narrow channel. Inextricable confusion would result if, under rule 25, an incoming vessel in the Main Ship Channel were to be justified in keeping close to its red buoys, and at the same time were to be held in fault because she did not keep hundreds of feet further east on the starboard side of the middle line of the entire body of water.

It is sufficient on this appeal to hold that in the case of a bay, which is also a port or harbor, the entire body of navigable water is not to be considered a single narrow channel within rule 25, where through such bay there have been officially designated a plurality of channels (i. e., more than one channel) running substantially parallel with each other and in the same general direction as the main flow of the tide or current.

In the second cause, error is asssigned that the amount of damages awarded is excessive. The Packard Company raised its scow No. 20 with its own appliances and men, work of that sort being part of its regular business. No objection is made to their doing so, but it is, quite properly, contended that they cannot be allowed more than a reasonable sum for doing the work. We are satisfied with the commissioner's reasoning and conclusion that the several items of charge for what was actually done were reasonable and proper. Claimant, however, called two expert wreckers to show that the scow might have been raised in some other way at a less expense. The difficulty with these suggestions is that both of them contemplated dumping the contents of the scow on the bottom of the channel where she lay. The owner was under no obligation to take the risk of prosecution under the federal statute against dumping in the harbor in order to save claimant from some part of the expense of raising the scow.

In the first cause the decree is affirmed, with interest, and one bill of costs against both tugs. In the second cause the decree is affirmed, but, since both sides appealed, without interest or costs.