### THE GLADYS.

### TOOKER v. PHILADELPHIA & R. RY. CO.

(Circuit Court of Appeals, Second Circuit. March 7, 1906.)

No. 102.

1. COLLISION—TUG WITH LONG TOW—CARE REQUIRED.

A tug navigating the ocean at night with three vessels in tow on a single line extending to a length of 4,000 feet is required to exercise the extremest care to avoid collision with crossing vessels.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 68–71.]

2. SAME—CROSSING SCHOONER.

An ocean tug with three barges in tow on a line, the whole being 4,000 feet in length, held in fault for a collision between one of the barges and a schooner off Barnegat, N. J., in the night, for failure to keep out of the way, as required by article 20 of the international navigation rules, Act Aug. 19, 1890, c. 802, 26 Stat. 320 et seq. [U. S. Comp. St. 1901, p. 2870], the tow being regarded as a single vessel. The contention of the tug that the schooner was an overtaking vessel, and so required by article 24 to keep out of the way of the tow, held not sustained by the evidence.

3. SAME—CONTRIBUTORY FAULT.

A tug with three barges in tow, the whole extending to 4,000 feet in length, and a schooner approached each other at night on converging courses, and a collision occurred between the schooner and the second barge. The night was clear and calm, with the moon shining brightly, and the schooner, which was making about five miles an hour, saw the tow for an hour and a half before the collision, and the tug crossed her course ahead at a distance of at least 800 feet; but she held her course until the first' tow had passed her 500 feet before making any change. *Held*, that while she was the privileged vessel, and the initial fault was that of the tug, it became evident, at least when the tug crossed her course, that a collision was inevitable, unless she took action to prevent 'it, and that she was chargeable with contributory fault for not taking . such action promptly.

Lacombe, Circuit Judge, dissenting on the facts.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeals from decrees of the District Court which held the steamtug Carlisle solely responsible for the damages resulting from a collision between one of her tow, the barge Oak Hill and the schooner Gladys. The opinion of the District Judge is reported in 135 Fed. 601. The following excerpts therefrom set forth the circumstances attending collision:

"The Oak Hill was being towed, in company with two other barges, the Phenix and Buck Ridge, by the tug Carlisle from Philadelphia to points east of New York. The length of the tug was 173 feet. The hawser between the tug and the first barge, the Phenix, was from 190 to 200 fathoms; between the Phenix and the Oak Hill it was about 175 fathoms; and between the Oak Hill and the Buck Ridge about 160 fathoms. The barges were each about 196 feet long. The whole tow was about 4,000 feet in length. The barges were loaded with coal. They had all sail set and drawing at the time of the collision. The Gladys was a three-masted schooner, 163 feet long, bound from Savannah to New York with a cargo of lumber. * * * She had all her sails set, excepting the fore and main topsails, which had been furled to delay her arrival in New York until the next morning. The weather was exceptionally fine with a full moon; the sea was smooth. It had been quite calm during a part of the day. The tug and tow passed Barnegat Light 5½ or 6 miles distant, about 7:30 p. m. and laid a course of N. E. ¼ E. for Fire Island Light. Her speed was probably in excess of six knots an hour. The schooner after being becalmed until about 4 o'clock in the afternoon, obtained a slight breeze from the S. W. and made about 3 knots on a N. by W. ½ W. course until about 8 p. m. The wind then veering more to the westward, she steered N. N. W. and the wind increasing, made somewhat better speed, probably 3½ knots, until just before collision, when it was greater, probably about 5 knots. * * * Both vessels kept their courses until in the extremity of collision, when the schooner put down her helm and shortly thereafter, about 10:15 or 10:20 collided with the Oak Hill."

During their mutual approach each was. seen by the other. On the barge, Seaman, the captain, first saw the schooner at a "little before 9"—again at 9:30 and again just before collision. Rumach at the wheel first saw her a little after 9, and McDonough, a passenger, at about 9; they saw her subsequently from time to time. On the schooner Peterson, then on lookout, first saw the tug (her three mast-head lights) at about 8:30, and thereafter from time to time till she crossed the schooner's bow, when he was at the wheel which he took at 10. Anderson first saw the tug's lights at about 9:30, and Karlsen about 9, and afterwards at intervals. The mate in charge of the navigation first saw her about 8:30, and observed her navigation as they drew nearer to each other.

Pierre M. Brown, for appellant.

Harrington Putnam, for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

PER CURIAM. The twentieth rule provides that:

"If two vessels, one of which is a sail vessel and the other a steam vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sail vessel." Act Aug. 19, 1890, c. 802, 26 Stat. 320 et seq. [U. S. Comp. St. 1901, p. 2870.]

That the directions in which these vessels were proceeding involved risk of collision is manifest from the event. The steam vessel—for the tug and barges for purposes of navigation with reference to others are to be regarded as a single vessel—was one of enormous proportions, some two-thirds of a nautical mile long. That vessel owners who willfully navigate in the track of other vessels with such essentially hazardous craft as this (it is the longest yet brought to our attention) should be held to the extremest care in their handling is established as the rule in this circuit by our decision in The Bee and The Booth (C. C. A.) 138 Fed. 303. So far from showing that extraordinary care was exercised by those in charge of the navigation, the owner of the tug and tows (the whole flotilla belonged to the railroad company) has not called a single witness from the Carlisle, neither navigator, wheelsman, lookout, or deckhand. This circumstance, in itself would seem to be sufficient to warrant the conclusion that whatever might have been the errors of others, she at least was in fault; but it is not necessary thus to condemn her, by default as it were. The record leaves her without excuse for violation of the twentieth rule, above quoted. The only theory advanced by the appellant, to relieve the tug from the obligation of that rule is that the schooner was an overtaking vessel, and governed by rule 24 which provides that "notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel." The same rule defines an overtaking vessel as one coming up with another vessel from any direction more than two points abaft her beam, so that at night the overtaking vessel would be unable to see either of the other's side lights. The vessels approached on courses which were not changed for more than an hour before collision. That fact is not disputed. The course of the tug was substantially N. E.; therefore, in order to make out that the schooner was an overtaking vessel it must be shown that she was, at some time while they were navigating as vessels encountering each other under the rules, approaching from back of a line drawn S. S. E. from the Carlisle's beam. Speed alone will not make a vessel "overtaking" unless she approaches through the area abaft the lines running two points abaft the beam. Counsel for the appellant has prepared diagrams illustrative of the situation as he contends it was; and he brings the vessels into the relative positions necessary to his theory only by assuming that the course of the Gladys was N. by E. It will be sufficient, therefore, to see what the evidence is as to her course, because the probative value of the diagrams must depend upon the accuracy and certainty of the data upon

which they are constructed. Speed is a factor in their composition; but in this case the speed is uncertain, for concededly the strength of the wind varied.

Distance as estimated by observers is another factor; but it is well known how uncertain such estimates are, especially when the object observed is a light seen at night over a broad expanse of water. The recollection of witnesses as to the estimates they made at the time of the direction in which observed objects bore is another and the most important factor; indeed it is mainly upon these estimates that the draftsman of the diagram relies for making the Gladys' course N. by E. The observers from the Oak Hill took no special notice of the schooner,—certainly not when she was first seen, having no responsibility save to follow after the tug they took no compass bearings, none of them took notice of any lights on the schooner until just before collision, many other sailing vessels were also incidentally observed about the same time. The observers from the Gladys when the tug's lights were first seen, apparently miles away, were under no apprehension, casually noted her position, without taking compass bearings, and now testify to their recollection of the estimate of bearings then made.

The direct evidence as to the course of the schooner is as follows: The captain testified that after passing Diamond Shoal lightship off Hatteras he made no land; that although the mate went part way up the rigging he could not make Barnegat Light; that from the soundings he made he calculated that he was 23 or 24 miles to the eastward (the range of Barnegat Light is 19 miles); that after the calm a light wind sprung up from the S. W. and he put the Gladys on a N. by W. ½ W. course. Reference to the chart shows that from the point where he estimated he was that was a proper course to bring him to the Sandy Hook Light, which, he says, he wanted to make. That the wind came over to the westward about 5 p. m. and he hauled in half a point and steered N. N. W. He left the deck at 8:40, and was below till just before collision. The log, kept by the mate, confirms his testimony as to the N. N. W. course; but there is some uncertainty upon the testimony whether the entries of wind and courses for two or three hours preceding collision were made at the time, or the next day when the narrative of the collision was written in. The mate came on duty at 8 p. m. He testified that the course was at first N. by W½W. which, about 8:30 or 8:45, was changed to N. N. W., which course was kept until just before collision. Karlsen says that he came on duty at 6 p. m. and took the wheel; that he steered N. W. by W. ½ W. for about 20 minutes or half an hour when he "got N. N. W., and then steered that course for an hour and a half" till he left the wheel at 10 p. m. Peterson says that he took the wheel at 10 p. m. relieving a sailor in his own watch (evidently Karlsen) who gave him the course of N. N. W., which he steered till just before collision.

In drawing a conclusion from the entire body of the testimony some observations of this court in The Helen G. Mosely and The Albano, 128 Fed. 402, 63 C. C. A. 144, are quite pertinent:

"It is quite plain that the statements of the schooner as to both course and bearing cannot stand. Which one is to be rejected? Apparently the one which is most liable to error, and whose elimination will make the harmo-

nizing of the remaining testimony most easy. * * * Now, in the testimony as to course, assuming the witnesses to be honest, there is one source of error, viz: defective memory. The witnesses testify to facts, not opinions. The man who gave an order, the man who heard it, the man who watched the compass card, all testify to their recollection of absolute facts. On the other hand, the testimony as to bearings is exposed not only to error resulting from imperfect memory, but also to error from careless or unskillful estimates. The witnesses testify to their recollection of an opinion formed by them, which opinion may not originally have been an accurate one. Upon the whole it might well be supposed that the schooner's testimony as to her course should prevail over her testimony as to the varying estimates of her watch as to bearings."

Upon the whole proof we are satisfied that the Gladys was approaching on a N. N. W. course, and was not an overtaking vessel within the twenty-fourth rule. Therefore the sole excuse offered for the navigation of the tug is unsound, and she was rightly held in fault for the collision.

The next question presented is whether the schooner was herself in fault. As a privileged vessel, she was bound to maintain her course so long as it was possible for the burdened vessel to avoid her, at least in the absence of some distinct indication that the burdened vessel was about to fail in her duty. We are of the opinion that the schooner had notice of the intention of the tug to hold her course, and thus create a situation where disaster was inevitable unless the schooner gave way, at a time when there was ample opportunity to have avoided a collision had she acted promptly and with ordinary skill and prudence. It was a clear night with the moon shining brightly. The schooner had seen the tug and tow for an hour and a half before the collision. Every fact necessary for her to know as to the make up and course of the tug and tow was apparent during all this time. She knew, if both vessels held their course and speed, that a collision was certain unless she succeeded in crossing ahead of the tug. That the tug with her tow, four-fifths of a mile in length, could cross ahead of her was, of course, an impossibility. The tug gave no indication of changing her course, and the situation was one calling for the utmost caution on the part of the schooner.

It seems improbable that the tug could have gone under the schooner's stern, with the Phenix, even had she commenced the manœuvre at a considerable distance from the point of intersection of the two courses, but it is conceded on all sides, that the moment the tug crossed the schooner's course it was impossible for the tug to go under the schooner's stern. The tug, by her own negligence, of course, had brought about a situation where a collision could be avoided only by the prompt intelligent action of the schooner. Can there be a doubt that it was her duty so to act? Was she justified in holding her course with stubborn determination when it was demonstrated that such action could only result in a collision? We think not. The law provides that in obeying and construing the rules of navigation "due regard shall be had to all dangers of navigation, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." The rules are not to be blindly followed to certain disaster. It behooves every navi-

gator to avoid a collision if he can do so and for manifest error, except in the jaws of collision, he must be held responsible. He cannot plead that his was the privileged vessel to relieve him from consequences which were induced by his own lack of prudence and common sense. When the tug crossed the schooner's course she was, according to the schooner's own testimony, over 800 feet ahead—we think she was much farther—but instead of taking immediate action she waited until the Phenix and about 500 feet of hawser between the Phenix and the Oak Hill had also passed, and then she luffed, and struck the Oak Hill at right angles.

Anderson, who was lookout on the Gladys, testified as follows:

"Q. And then did the tug cross your bow? A. Yes. Q. And was ahead of you? A. Yes. Q. And the hawser was ahead of you? A. Yes. Q. And you continued right on, did you? A. Yes. Q. No orders given? A. No, not to me; only, when he was coming close up, the mate came forward and told us to slack off the sheets. Q. When he gave that order where was the first barge? A. We were just between the first and second barge. Q. You were between the first barge and— A. Just in the middle. (The hawser between the first and second barge was 1,050 feet.) Q. The first barge had passed you, had it? A. Yes. Q. The first barge was not forward of your bow, was she? She was straight ahead of you, was she? A. No; the first barge had passed our bow then, when we got the orders. Q. When you got the orders? A. Yes. Q. And the second barge, where was she? A. She was a little on the port side. Q. Abaft of your beam or forward? A. No, forward of the beam. Q. Forward of your beam? A. Yes. Q. And about how far away? A. About two or three ship's lengths. Q. Do you know how the boats came together? A. Well, I don't know, because I had no time to see that; I just looked out for myself to run aft. Q. When you cast off your head sheets and luffed up, what course were you on then? A. I don't know. I was not aft. Q. Were your sails shaking? A. No—they were shaking a little—the spanker was shaking."

It seems to us that even at this time the safer course was to fall away so that the blow, if it came, would be received when the vessels were on a parallel or slightly divergent courses. The testimony is in conflict on this question, but we think that the preponderance of proof is to the effect that to veer away offered a fair chance of escape and that, in view of the unusual length of the tow, to luff directly across the course of the barges was simply to court disaster.

Aldrich, the expert on navigation, called by the schooner, testified as follows:

"Q. I am placing the schooner there just as a suppositious case; say she is two or three lengths away and the courses of the tug and tow were crossing, do you think she could have worn six points without striking? A. I don't know but what she might. Q. Suppose she was five or six ship lengths away; there is no doubt about that? A. There is no doubt about it then."

It is not necessary, however, to decide this question, as the schooner may, perhaps, be considered as in extremis at that time. Her initial fault was in waiting until she got in this perilous position. If, the moment she saw the tug cross her course, she had gone off to starboard she would certainly have escaped, and she probably would have done so by coming up into the wind and going off on the other tack. Her hesitation at the crucial time was inexcusable. She had plenty of time to prevent a collision after it was evident that she alone could

prevent it, and for her fatal procrastination she must be held in fault and bear her share of the loss.

The decree is reversed, with costs of this appeal, and the causes are remanded, with instructions to decree in conformity with this opinion.

LACOMBE, Circuit Judge. So far as the majority of the court finds that the Gladys was in fault, because she waited until after the Phenix, the first barge in tow had crossed her course before she luffed, or because the last point at which the tug could, by change of manœuvre, have saved the situation was somewhere short of the point of intersection, I am unable to concur, because the testimony given in the case is to the direct converse of both these propositions, and there is not a word of testimony supporting either; the majority of the court have evidently confused the testimony as to slackening head sails with that as to change of helm and course. As to the conflicting testimony touching the question whether the Gladys should have changed her course by falling off or by luffing, I cannot concur in the conclusion that the preponderance is in favor of falling off, because the expert witnesses who expressed that opinion did so upon the assumption that she was heading north, while we have all concurred in the finding that she was in fact sailing on a N. N. W. course.