### THE MARY E. MORSE.

(District Court, D. Massachusetts. March 6, 1908.)

#### No. 1,794.

1. COLLISION (§ 95*)—CONSTRUCTION OF RULES—OVERTAKING VESSEL—"PAST AND CLEAR."

Where a schooner, which had left Norfolk and was beating down the channel against a head wind, when she was overtaken and passed by a tug and tows, which left Norfolk later, was on the starboard tack, moving toward Old Point Comfort and away from the tug and tows, the latter were "finally past and clear," within the meaning of article 24, of the Inland Navigation Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]); and when the schooner came about on the port tack, heading toward the tug and tows, and being more than two points abaft their beam, an entirely new risk of collision arose, as to which she was the overtaking vessel, and bound under such rule to keep out of the way, while the tug and tows were required by article 21 to keep their course and speed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

2. COLLISION (§ 95*)—OBSERVANCE OF RULES—TUGS WITH LONG TOWS.

Tows of the length of 4,000 feet or more, when navigating frequented waters, are *held* to an extremely strict observance of the rules for preventing collisions.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

3. COLLISION (§ 95*)—SCHOONER AND TUG WITH TOWS—FAULT OF TUG.

A tug with a number of tows on hawsers, the total length of the tow being over 2,000 feet, which, while passing down Hampton Roads in the daytime and while an overtaking schooner was approaching the rear barge of the tow on an oblique course, slowed down to half her speed and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

signaled the tows to let out their hawsers to double their former length, was solely in fault for a collision between the schooner and barge, where the schooner was carefully and properly navigated, and would have passed under the stern of the barge if the latter had maintained her speed, as required by article 21 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]).

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit by Charles C. Sparks against the schooner Mary E. Morse. Decree for respondent.

Hughes & Little, for libelant.

Blodgett, Jones & Burnham, for claimant.

DODGE, District Judge. The libelant was master and his wife owner of the barge Kathleen. He sues for damage to the barge received in a collision with the schooner Mary E. Morse, which occurred at about 6 p. m. on April 15, 1906, in full daylight and fair weather, near Old Point Comfort, Va. The barge was the last in a line of seven barges, all being towed to sea from Norfolk by the tug Helen and bound for Philadelphia. The schooner, which was a three-masted vessel, had all sail set except her foretopsail, and was also bound to sea on a voyage to Colon. The barge was without motive power of her own, and had on board only one man and a boy. The operation of towing her was under the sole control and direction of the tug.

Tug and barges constituted one steam vessel for the purposes of the statutory rules of navigation, so far at least as to put upon them the burden of avoiding the schooner, unless the schooner was with regard to them an overtaking vessel, within the meaning of article 24 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), and therefore bound to avoid them. The schooner had been at anchor in Hampton Roads above Sewall's Point. She was obliged by the wind, which was N. N. E. and light, to beat down the channel, making successive tacks from one side of it to the other. When the tug and barges passed out of the Elizabeth river into Hampton Roads by Sewall's point, the schooner was further down the channel than they were. They afterward passed her, and upon her coming about from the starboard tack to the port tack, on which she was sailing when she struck the barge, they were all further down the channel than she was. She came about, at the time referred to, quite close to the shore and near Old Point Comfort, and when she did so the tug and barges had all passed the Rip Raps and were heading obliquely across the channel in the direction of the Thimble Light, which is about three miles below the Rip Raps, and on the opposite, or Old Point Comfort, side of the channel. As the Morse headed when fairly on the port tack after coming about, her direction was about E. by N. by compass, and she had the tug, with most of the barges, on her port bow, while the Kathleen, with the next barge ahead, bore on her starboard bow. According to the evidence from on board her, the Kathleen then bore 3 or 4 points on her star-

board bow. According to the evidence from the tug and the Kathleen, the Morse was on the Kathleen's port quarter. If the vessels thus bore from each other, the Morse was more than two points abaft the beam from the Kathleen, and still further abaft the beam from the tug and from every other barge in the fleet. This is true, even if their direction was not directly for the Thimble Light, as they say it was, but more to the northward as the schooner claims it to have been. The Morse therefore, steering E. by N., was "coming up with" the "Kathleen" from a direction more than two points abaft her beam. To avoid this conclusion the direction of tug and barges must be found to have been much more northerly and more directly across the channel than any one claims or than anything in the evidence indicates. The schooner was therefore bound to avoid the Kathleen as an overtaking vessel under article 24.

It is argued on her behalf that the tug and barges were overtaking her above Old Point Comfort, and that they therefore continued to occupy that relation to her, by virtue of the provisions of article 24 that—

"no subsequent alteration of the bearing between the two vessels shall make an overtaking vessel a crossing vessel, * * * or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear."

In my opinion, however, the tug and barges were "past and clear" of her when she was standing toward Old Point Comfort on the starboard tack, and they had passed the Rip Raps on their way to sea. At that time she was sailing away from them and they from her, without any risk of collision whatever. Article 24 had then ceased to have any application, and it continued to have none until the fresh risk of collision arose, which was involved in her tacking and standing toward them again on the port tack. Her duties must be determined by the relative positions and courses of the vessels when this renewed risk of collision became involved.

The Morse's collision with the barge on this tack was not for want of a careful lookout on her part. While crossing so much of the channel as lay between her and the tug and barges, her master had the wheel, all hands except the steward were on deck, her mate was on lookout forward, and there is every indication that a careful and constant watch was kept upon the tug and barges and their movements for the very purpose of getting by them safely.

The Morse's speed on this tack was probably little, if at all, in excess of three knots an hour. The tug and tow were moving at a somewhat faster rate. As the Morse kept on toward them close-hauled, they passed across her bow until she had the Kathleen ahead or nearly so, and had all the other barges on her port bow. Her helm was then put up in order to pass astern of the Kathleen and her spanker sheet slacked. Regarding her as the vessel bound to keep clear, this was a proper method of attempting to perform that duty. The only alternative was to come about and again head away from the barges on the starboard tack. There were two reasons against adopting this course. First, the Morse naturally desired to run out her tack to the channel limits; and she had the right to do so unless

she would necessarily endanger the tug and barges by attempting it. The other reason was the presence on her port quarter, not far behind, of another schooner, the P. T. Barnum, also close-hauled on the port tack and crossing the channel, and therefore on a course nearly parallel with and to windward of her own course. Under the circumstances I do not think she can be held in fault because she did not come about. It cannot be said, in my opinion, that the attempt to pass astern of the Kathleen necessarily endangered that vessel. The course and speed of the Kathleen at the time were such as to encourage the belief that the attempt would succeed. It was, of course, incumbent on the Morse to keep off before getting so near the Kathleen as to make the attempt to pass astern of her necessarily dangerous for want of sufficient room. She was bound to keep clear by a sufficient margin and avoid dangerous proximity. But what proximity is to be considered dangerous, or what margin sufficient, must obviously depend upon all the circumstances. In broad daylight, and giving special attention to the duty of avoiding the Kathleen, as I think the Morse was doing, she might properly allow herself to approach that vessel much more closely than would be proper after dark or under circumstances in any way obstructing accurate observation and judgment. I think the evidence shows that the Morse kept off soon enough and at a sufficient distance from the Kathleen to have passed her in safety, had the Kathleen kept her course and speed as required by article 21. The Morse, in my opinion, had the right to act upon the assumption that tug and barges would keep their course and speed, so that the Kathleen would continue to move out from under her bow at the same rate as before her helm was put up.

This, however, the Kathleen did not do, on her own showing. The tug and barges had left Norfolk with from 45 to 50 fathoms of hawser between each two members of the tow. If any of the barges had paid out their hawsers to the length considered desirable for towage at sea (about 100 fathoms), no such general change was made until some time after the whole tow had passed the Rip Raps. The tug then signaled by whistle to the barges generally to lengthen the hawsers, and slowed to half speed in order that this might be more easily done. At this time the rear barge, by the testimony of the master of the tug, was some three-quarters of a mile past the Rip Raps, the tugs and barges were about in mid-channel, heading about for the Thimble Light, and the Morse was on the port tack, headed therefore toward the barges, and was about 400 yards from the rear barge. I think the evidence shows that when the Morse had come so near as to require her to maneuver in order to avoid the Kathleen, and had begun to do so, the Kathleen's headway was checked by the slowing of the tug, that the Kathleen's previous rate of progress, upon which the Morse had the right to rely, was changed, and that the effect of thus altering the relative speeds of the two vessels on their crossing courses was to leave the Kathleen under the Morse's bow at a moment when the Morse had properly expected her to have passed ahead out of danger. Although the Morse's wheel was hard up, and notwithstanding that her spanker sheet was allowed to run out as far as the knot when the Kathleen's progress was seen

to be thus arrested, in an attempt to make her keep off as rapidly as possible, she did not quite succeed in swinging clear of the barge's stern, and struck the port side some 10 feet forward of the stern.

With only 45 fathoms of hawser between each two of its members, the total length of this tow considerably exceeded 2,000 feet. To lengthen the hawsers to 100 fathoms was to double this total length. Tows of such length, when navigating frequented waters, are held to an extremely strict observance of all precautionary requirements. The Gertrude, 118 Fed. 130, 55 C. C. A. 80; The Admiral Schley, 131 Fed. 433, 65 C. C. A. 417; The Bee, 138 Fed. 303, 70 C. C. A. 593; The Gladys, 144 Fed. 653, 75 C. C. A. 455. It would be difficult under any circumstances to justify the attempt to double the already dangerous length of this tow, made as it was while occupying the middle of a channel which other vessels, not far off at the time, were also using. Resulting as it did in changing the Kathleen's speed, in violation of the rule then applying between the Kathleen and the Morse, I hold it to have been the sole cause of this collision.

The evidence affords no ground for charging the barge with independent fault of her own, in which the tug had no share. The fault which caused the collision was a fault on the part of the whole tow to which she belonged at the time, and is chargeable to the tug, which controlled and directed its movements. The tug is not before the court; no proceedings having been taken against her. The effect of her fault for the purposes of this case is to prevent the conclusion that the Morse was negligent, and therefore to require the dismissal of the Kathleen's libel against her.

The libel is to be dismissed, with costs.