### THE HELEN.

(District Court, D. New Jersey. April 10, 1913.)

1. COLLISION (§ 61*)—TUG WITH TOWS AND OVERTAKING SCHOONER—NEGLIGENCE OF TUG.

A tug which, with a tow of seven barges on a hawser, the entire length being about 2,000 feet, in the daytime, stopped and directed the barges to lengthen their hawsers to double their former length when an overtaking schooner was approaching on a tack, heading almost directly toward the rear barge, and within a quarter of a mile, was solely in fault for a collision between the schooner and such barge, both for failure to exercise ordinary care under the circumstances, and for violation of article 21 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which required her to keep her course and speed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*]

2. COLLISION (§ 59*)—OBSERVANCE OF RULES—TUGS WITH LONG TOWS.

Tows of 2,000 feet or more in length, when navigating frequented waters, are held to an extremely strict observance of all precautionary requirements to prevent collisions.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 72; Dec. Dig. § 59.*]

In Admiralty. Suit by Charles C. Sparks, as master of the barge Kathleen, against the tug Helen. On final hearing. Decree for libelant.

Willard M. Harris, of Philadelphia, Pa., for libelant.

Howard M. Long, of Philadelphia, Pa., for respondent.

CROSS, District Judge. The libelant in this case seeks to recover damages which the barge Kathleen, owned by his wife, but of which he was master, received April 15, 1906, towards evening, in a collision with the schooner Mary E. Morse, in Hampton Roads, at or near Old Point Comfort, Va. The day was clear, and when the accident occurred it was still perfectly light. The tide was ebb, and running about two miles an hour, and the wind fresh, and blowing about eight miles an hour. The tug Helen had in tow the barge Kathleen, with six others, all heavily laden with lumber; the injured barge being the last of the tow. The tow was made up at Norfolk, Va., and was bound for Philadelphia. The barges, including the Kathleen, were without motive power. The Kathleen was under the care of the libelant and a boy about 16 years old. The tow as first made up, and as it remained until just prior to the accident, was about 2,000 feet in length. The Morse was a three-masted sailing vessel, just putting to sea, bound for Colon, Isthmus of Panama.

Before giving the particulars of the collision, it should be stated that the question of whether or not the schooner was responsible for the damage done the Kathleen on the occasion just mentioned was adjudicated by the United States District Court for the District of Massachusetts between the following parties and under the following circumstances: It appears that, shortly after the collision, Sparks, the libelant herein, employed counsel at Norfolk, Va., to whom he gave the facts pertaining thereto as he understood them; that they thereupon employed counsel in Boston, who filed a libel for damages in behalf of Sparks against the schooner Mary E. Morse. By the allegations of that libel, the fault and blame of the collision were wholly placed upon the schooner, and the tug Helen was impliedly exonerated. Upon final hearing, however, the libel against the schooner was dismissed, upon the ground, as given by Judge Dodge, that she was not at fault, but that the tug was. That case is reported in 179 Fed. 945.

The libelant's explanation of his reason for not proceeding against the tug in the first instance is in substance as follows: That he fully stated the facts concerning the collision to his counsel at Norfolk, and thereupon left it with them to proceed against whichever party they deemed liable; that he at no time, prior to the institution of his suit in the Massachusetts court, had any interview with their Boston correspondent, nor had he ever seen or read, or heard read, the libel therein, which was signed and verified by such correspondent as proctor, until it was shown him upon cross-examination during the taking of his testimony in this suit. This explanation of the matter by Capt. Sparks seems fair and reasonable, and leaves the libelant untrammeled to tell his story afresh, and that, too, without having it viewed from the very outset, as otherwise it might have been, with more or less of suspicion and prejudice.

The facts as they have been made to appear in the two cases are

substantially the same, notwithstanding they have not been testified to by identically the same witnesses; consequently the clear and carefully prepared opinion of Judge Dodge is of much service to this court, and all the more, perhaps, because in this case, as in that, the attempt has been made by the respondent for the time being to put the entire blame upon the party not represented in court.

[1] Returning, now, to the period just preceding the collision, it appears from the evidence that, when the middle of the tow was about three quarters of a mile below the Rip Raps, the tug signaled the bargemen to lengthen their hawsers. Before this signal was given the tow had passed the schooner Morse, which was then moving rather slowly in a light breeze on the starboard tack. Later, the wind having freshened, the schooner, then on the port tack, had overtaken the tow, and, with its course directed nearly towards the Kathleen, was within a quarter of a mile of that barge when the tug gave a signal to lengthen the hawsers, as above stated. The master of the tug admitted that the schooner was on the port tack, and headed as nearly as he could tell for the forward part of the stern barge (Kathleen), when he stopped his engine to permit the bargemen to lengthen their hawsers. The following questions and answers then appear upon his cross-examination:

"Q. How far away was the schooner at that time from the last barge? A. The schooner was overtaking us all the time. Q. Had she gotten nearer than a quarter of a mile to you? A. When we first slowed down she was about a quarter of a mile from the stern barge, and at the time of the collision she was right close to it. Q. At the time you stopped, I want you to give me the relative positions of the schooner with respect to your last barge? A. You mean at the time the tug was stopped? Q. Yes, sir. A. I should say she was maybe a little bit less than a quarter of a mile from us at the time. Q. She seemed to be gaining on you all of the time, did she? A. Yes, sir; she seemed to be getting a little bit nearer to us all of the time. Q. The wind was freshening, was it? A. Yes, sir; it was."

It elsewhere appears that at this time the schooner was going about twice as fast as the tug, so that this situation was presented: The schooner sailing, according to the evidence, at the rate of 4 or 5 miles an hour, and twice as fast as the tug with its tow 2,000 feet long; the schooner less than a quarter of a mile away, and constantly and with some rapidity drawing nearer to the tow, when the tug is suddenly stopped almost under the bow of the advancing schooner for the purpose of doubling the length of an already unusually long and unwieldly tow. The evidence shows that the schooner struck the Kathleen on her stern port quarter, and that, had the position of the barge been advanced at the time by only 20 or 30 feet, she would have escaped the blow. I agree with Judge Dodge that the master of the schooner had the right to assume that the tug and her tow would maintain their course and speed, which, as he had shown, they were required to do under article 21, which then controlled them.

The evidence furthermore shows that, at the time the collision happened, the wind was blowing from N. N. E.; that the tug was heading northwardly towards Thimble Light; that the tide, as above stated, was ebb; and that, as the tug slowed up to permit the barge-

men to lengthen their hawsers, the barges in the rear of the tow, under the influence of the wind and tide, naturally drifted southwardly, while the tug headed northward toward Thimble Light, whether stopped or, as the master at one time says, moving at half speed, held the barges nearest it somewhat firmly in position, and thus the tow was made to form a barrier across a considerable portion of the channel. Indeed, several witnesses say in substance, if not specifically in words, that the tug and tow obstructed the channel; that they formed an arch well across it, whereby the schooner's movements were cramped so that under the circumstances it was impossible to have maneuvered her otherwise than she was.

In view of the situation thus described, and of the testimony of the captain of the tug above quoted, I am not inclined to accept his testimony to the effect that the engine was not stopped at the time, but was only slowed down to one bell, or half speed, and that the hawsers were at all times kept taut; but, were the fact otherwise, he would still have been to blame for the collision in doubling the length of his already long tow when, as, and under the circumstances he did.

As stated above, article 21 controlled the tug and its tow at the time of the collision; but, even had that not been the case, and were there no such article in existence, it would still have been manifestly negligent for a tug, having in charge an unusually long and unwieldly tow, to stop suddenly almost in front of a schooner's bow, lengthen the hawsers throughout the tow, and thereby double, or more than double, its length. In the case at bar, it was plainly the duty of the master of the tug to have maintained his course and speed until the schooner had passed to the stern of the tow. Common prudence and article 21 both required this.

[2] As already noted, the tow was unusually long, so long, indeed, that when the hawsers were lengthened it was fully three quarters of a mile, and perhaps more, in length. As said by Judge Dodge:

"Tows of such length, when navigating frequented waters, are held to an extremely strict observance of all precautionary requirements"—citing The Gertrude, 118 Fed. 130, 55 C. C. A. 80; The Admiral Schley, 131 Fed. 433, 65 C. C. A. 417; The Bee, 138 Fed. 303, 70 C. C. A. 593; The Gladys, 144 Fed. 653, 75 C. C. A. 455.

To which may be added The Plymouth, 186 Fed. 108, 108 C. C. A. 217, of this circuit, with the cases therein cited.

Proctor for claimant insists that the fault was that of the schooner, which under article 24, as the overtaking vessel, which he claimed she was, was bound to keep out of the way of the overtaken vessel. But, if that were admitted, still the schooner would be blameless for colliding with a barge, which so suddenly stopped in the schooner's course, and so near to its bow, that it was impossible to avoid it. Article 24 does not pretend to deal with such a situation.

A decree will accordingly be entered in favor of the libelant, with an order of reference to a commissioner to ascertain and report the amount of his damages.