## THE POCOHUNTAS.

## THE MAIA.

(District Court, S. D. New York. October 9, 1914.)

**1. COLLISION (§ 72*)—TOW AND ANCHORED VESSEL—MUTUAL FAULTS.**

One of a tow of 24 barges coming down North River in the evening on a slack tide at a speed of about three miles an hour came into collision with the steamship Maia, anchored near the western side of the channel, which was 1,500 feet wide. The master of the towing tug, which also had a small tug as a helper, undertook to pass on the west side of the steamship. There was room to have passed to the eastward in the channel, and also to have passed on the west side, if the tow had been properly handled by the use of the helper. The Maia had been anchored near or beyond the edge of the anchorage grounds, and so that by the action of the tide she swung into the fairway for some 300 feet. *Held*, that the tug was primarily in fault, because she could have passed with tow by exercising due care; that the Maia was improperly anchored, and for that reason was not exonerated as an anchored vessel, but was chargeable with fault which contributed to the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 102; Dec. Dig. § 72.*]

**2. COLLISION (§ 69*)—ANCHORAGE IN NAVIGABLE CHANNEL.**

The duty is imposed on vessels coming to anchor in navigable channels to see that they do not under any circumstances, accidents excepted, prevent or obstruct the passage of other vessels.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

In Admiralty. Suit for collision by John H. Flannery, owner of the barge Economy, against the steam tug Pocohuntas, with the German steamship Maia, impleaded. Decree for libelant against both respondents.

James J. Macklin, of New York City, for libelant.

Amos Van Etten, of Kingston, N. Y., for respondent The Pocohuntas.

Chauncey Clark and Burlington, Montgomery & Beecher, all of New York City, for respondent The Maia.

SHEPPARD, District Judge. This is a collision case, brought here by the libelant, John H. Flannery, owner of the barge Economy, against the steam tug Pocohuntas, for damages sustained to the former while in tow of the Pocohuntas and brought in collision with the German steamship Maia, at the time temporarily at anchor near the Jersey shore of the North River. The cause of the collision is charged by the libelant to the negligence and bad seamanship of the master of the steam tug Pocohuntas. The steamship Maia is brought into the case under the Fifty-Ninth admiralty rule (129 Sup. Ct. xlvi) on the petition of the owner of the Pocohuntas, alleging that the Maia was responsible for the collision, due to her improper and misleading position off the anchorage ground.

[1] The collision the proofs show to have occurred about 8 o'clock in the evening of May 18, 1914. The Maia had been left at anchor by

Harbor Pilot Fernald about two hours previous, head down to the "westward of the white spar buoy' off Edgewater, and to the westward of the drilling machines in the river." The weather was fair, the tide slack, and the night calm and starlit. The Pocohuntas was descending the river with a tow of twenty-four barges (four light and twenty loaded), assisted with the tow by a smaller steam tug, the Virginia. The tugs, with their tow, had just cleared the digging machines in the river when the lights of the Maia were "dimly sighted" from "600 to 700 yards" straight ahead.

According to the testimony for the steam tug Pocohuntas, her master could not make out at first what sort of craft the lights were on. Owing to the great number of lights set out in this part of the river it was difficult to locate the object they were on until the outlines of the ship's bulk were made out, and it was not until then that the master of the Pocohuntas discovered that the object, if anchored, was off the anchorage ground and "near the middle of the fairway." Lights in the distance down the fairway were taken to be boats ascending the river with tows; but, as the testimony disclosed, when discovered by the crew of the Pocohuntas, were from three-quarters to a mile away, but, as seen, the intervening time before the ascending tows reached the scene of the collision afforded adequate opportunity for the tug Pocohuntas to have kept to the fairway and to have cleared the Maia on the east side.

The master of the Pocohuntas, as explained, to avoid confusion and danger with the ascending tows determined' upon a course to the starboard of the Maia and accordingly put his helm to the port, sheering abruptly in a direction toward the Jersey shore. The Pocohuntas, with the two first tiers of her tow, cleared the port bow of the Maia, which was at this time pointing northwestwardly toward the Jersey shore. It was then that the master of the Pocohuntas realized that a collision was imminent. When the Pocohuntas righted her course down the river, the middle of her tow was caused to swing in and collide with the port bow of the Maia, with the resulting damage to the barge Economy.

The direction taken and the course pursued by the Pocohuntas after discovering the position of the steamer, and, it is contended, her failure to dispatch the helping tug Virginia back to right about the tow, when a hazardous situation was obvious, was the fault or omission proximately responsible for the collision. The weight of the evidence clearly supports this theory.

Libelant's testimony tended to show that at the point of the collision the river was from three-quarters to a mile wide, with a fairway of about 1,500 feet. The tow was approximately 2,000 feet long, including hawser, and, accepting the estimates of the respondent's witnesses, the Maia was discovered from 600 to 700 yards straight ahead. At this time, according to the testimony, the tide was slack and the tow had no momentum, other than that produced by the speed of the tugs, which, as conceded, was not more than 3 miles an hour. Therefore it appears that at the distance the indefinable object (the Maia) was discovered, if there were any room for doubt as to the best course in such circumstances, the master of the Pocohuntas had sufficient time to have ascertained the nature of the object and to have given such warning to the

Maia, which was then under steam, as would have devolved upon the steamer the duty of righting about and dropping out of the way.

The evidence shows that there was sufficient fairway to permit the tugs and tow to pass the steamer Maia to the New York side. Whatever may have been the judgment of those in charge of the Pocohuntas, the fact is established by a clear preponderance of the evidence that the Maia was anchored toward the Jersey side; the testimony putting it at about one-third the width of the river out. The conclusion is irresistible that the passage to the west or Jersey side of the Maia might have been safely accomplished, had the master of the Pocohuntas exer; cised the usual precaution in such exigencies of sending the helping tug back to push the threatened portion of the tow clear.

Confronted with this situation and having present the choice of two courses to escape the danger of collision, the master of the Pocohuntas elected to take obviously the most dangerous. The law imposes, in such circumstances, the duty of exercising the greatest diligence to avoid danger to other craft as well as to safeguard the tow in charge. Manifestly the best course to have taken was to the left of the Maia and to have remained in the fairway. The anchored vessel could, no doubt, have been cleared without incurring any risk of collision. The apprehended danger from the distant lights, and the assumption that they were ascending boats and tows, in the light of subsequent events, can scarcely excuse a cautious navigator of some 20 years' experience from his failure to adopt such a course as only reasonable prudence would suggest. It is abundantly shown that the fairway offered sufficient room for the safe passage of the tows.

Obviously the most dangerous course lay to the starboard of the Maia, and when the master of the Pocohuntas elected to take it, there devolved upon him the duty of signaling such purpose to the anchored craft and to have sent the helping tug to control the swing of the tow. From the moment that the master of the Pocohuntas discovered the unexpected object in the fairway, it became his imperative duty to secure the safety of his tow by every means at hand and not to run any avoidable risk. It seems that the fault of the Maia in improperly anchoring would not exonerate the Pocohuntas, if the latter had any practical way of avoiding the danger of collision which would be apparent to an experienced navigator. The degree of diligence required in such situation is well stated in the following cases: The Delaware (D. C., N. Y.) 12 Fed. 573; The Gertrude, 118 Fed. 130, 55 C. C. A. 80; The Admiral Schley, 131 Fed. 433, 65 C. C. A. 417; The Bee, 138 Fed. 303, 70 C. C. A. 593; The Gladys, 144 Fed. 653, 75 C. C. A. 455; The Plymouth, 186 Fed. 108, 108 C. C. A. 217; The Helen (D. C., N. J.) 204 Fed. 653.

In view of the evidence, the court is constrained to hold in this branch of the case that the negligence of the towing tug was the proximate, although not the sole, cause of the collision.

We turn, now, to the anchorage of the Maia as a contributing cause. The testimony in this branch of the case is most conflicting; some of the witnesses placing the steamer wholly on the anchorage ground, while others place her well in the fairway. The fact, however, is uncontradicted that the Maia was anchored in 21 feet of water, with the

tide 2½ feet to fall and the ship drawing 18 feet. Hence it is seen that there was only about 6 inches clearway under the keel from bow to stern, and the ship having a swing radius of about 375 feet toward the fairway.

The master of the Maia went aboard about 7 o'clock in the evening, when he was informed by a passing fisherman that the Maia lay in shoal water. It is also shown that the master evidenced some anxiety regarding the position of the steamer, for he immediately took soundings, which showed 21 feet all around. It is not probable that an experienced navigator would take a chance with so close a margin between the draft of the vessel and the depth of the water. While the master of the Maia and the crew denied that her position had been changed, the testimony of the crews of both towing tugs placed her near the middle of the fairway. The testimony of Monk, a disinterested witness, and one familiar with the surroundings, who was at the time lying with his tug at the stakeboat about 600 feet from the Jersey shore, between it and the Maia, and who went immediately to the scene of the collision, placed the Maia well out in the fairway and off the anchorage ground.

Considering most favorably the testimony of the crew of the Maia, her position was admittedly close to the prescribed boundary, and it is not at all improbable that with the swing of the vessel, the distance of her length and chain—375 feet—she could have drifted well over on the fairway. To have left the steamer anchored in this manner when the tide was slack, and aware that she would right about with the tide, and in so doing would probably encroach on the fairway and assume the awkward position in which she was found by the Pocohuntas, is conduct not to be entirely condoned. When we consider the enormous and continuous traffic on this river where the collision occurred, it is plain that this was not the exercise of such care and caution as the conditions and circumstances required.

Aside from any consideration of the requirements of the navigation laws and regulations, the position of the Maia was well calculated to confuse, mislead, and impede navigation, and no doubt influenced the errors committed by the Pocohuntas. It was obvious that the effect of the tide would be to shift the vessel, and her position when discovered by the Pocohuntas was one to be reasonably anticipated. It was shown that the Maia, when sighted, was heading northwestwardly, with an encroachment on the fairway of about 300 feet, and it is the inevitable conclusion that the careless and improper anchoring of the Maia was a contributing cause to the collision, and she is not therefore entitled to the privileges of a vessel so anchored through necessity. The Margaret J. Sanford (D. C.) 203 Fed. 331.

[2] The duty imposed on vessels coming to anchor in navigable channels is to see that they do not under any circumstances (accidents excepted) prevent or obstruct the passage of other vessels or craft. Assuming that the Maia had the right to anchor where she did, with the reasonable effect of the tide to be anticipated, her stern as well should have been anchored, or other appropriate measures adopted as would have prevented unnecessary encroachment on the fairway. Section

15 of the Navigation Act (Act March 3, 1899, c. 425, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543]) above alluded to provides:

"That it shall be unlawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels."

Vide The Delaware, supra; The Georgia (D. C., R. I.) 208 Fed. 636; The John H. Starin, 122 Fed. 236, 58 C. C. A. 600; The Bourgogne (D. C., N. Y.) 76 Fed. 868; The Ogemaw (D. C., Wis.) 32 Fed. 919–925.

Upon the evidence the court is constrained to hold that the towing steam tug Pocohuntas was primarily at fault for the collision, but that the improper anchorage of the Maia contributed, and the damages sustained will be apportioned equally, so that the Pocohuntas and the Maia shall stand liable to the owner of the Economy, each for one-half the damages, and an accounting will be had to ascertain the extent thereof, whereupon a decree will be entered against each vessel.

Let decrees be prepared accordingly.