## THE SEA KING.

## THE BUFFALO.

### (Circuit Court of Appeals, Second Circuit. February 7, 1902.)

### No. 98.

COLLISION—STEAMSHIP AND BARGE IN TOW—FAULT OF TUG.

The tug Sea King was coming up the lower New York Bay, having two barges in tow tandem, in all about 1,200 feet long, when the second barge came in collision with the steamship Buffalo, outward bound, and was sunk. The collision occurred from 250 to 300 feet to the westward of the center of the channel. After signals for passing port and port were exchanged between the Buffalo and the Sea King, the latter ported her helm two points, and continued on such course until she had passed, and then at once resumed her former course. *Held*, that the Sea King was in fault for failing to take proper measures to counteract the effect of the flood tide, which drifted her and her tow into the westward side of the channel, contrary to rule 25, and also in resuming her course before her tow had passed the Buffalo. *Held*, also, under the evidence, that neither the barge nor the Buffalo was in fault; that, while the latter was aware that the tow was drifting nearer her course, after the tug ported both she and the first tow drew away and passed at a safe distance, and had she continued on such course, as the Buffalo had reason to expect, the second tow would also have been drawn out of danger, and that after the danger became apparent she made all proper efforts to avoid collision.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Suit for collision.

The following is the opinion of the district court, by BROWN, District Judge:

At about 5:30 p. m. of October 1, 1898, as the three-masted coal barge Samuel E. Spring was going up the Lower Bay in tow of the tug Sea King, with the tide about two hours' flood, she came in collision below the Narrows with the steamship Buffalo outward bound, some 100 or 200 yards above black buoy No. 9, and was sunk in three or four minutes afterwards. The above libel was filed to recover for the loss of the barge and her cargo.

The Spring was the hindmost of two similar barges each about 135 feet long, forming a tandem tow in all about 1,200 feet long. Each barge was on a hawser, which at the Scotland lightship had been shortened to about 70 fathoms. The tug and tow came up through the Swash Channel, rounded within 50 or 100 feet of the bell buoy, as their witnesses say, at the exit of that channel, and took a course, according to her master, of N. x E. ½ E., going through the water at the rate of about 4 to 5 knots. When about one-quarter of a mile above the bell buoy, with the tow directly astern, a signal of one whistle was exchanged between the Sea King and the Buffalo, which was seen coming down about three-fourths of a mile or a mile distant, and a very little on the tug's port hand at the rate of about nine knots. Soon after, according to the Sea King's testimony, her wheel was gradually ported until at the time the Buffalo was abreast of her, her heading was N. E. ½ N., and the Buffalo passed her at the distance of 200 or 300 feet. The first barge, the Carleton, passed the Buffalo only a little nearer; but the Buffalo's stem struck the port quarter of the second barge abreast of the mizzen rigging at an angle of about two or three points, breaking in that part of her side and causing her, as above stated, to sink almost immediately. Each side contends that the vessels would have cleared except for a sheer which each insists was given by the other at about the time when the Buffalo was

abreast of the Carleton. The witnesses for the tug testify that the Buffalo at that time gave a rank sheer to the eastward; and several witnesses from the Buffalo say that the Spring, by a hard a-port wheel, swung her stern across the Buffalo's stem.

The greatest draft of the tug and tow was 19½ feet. They had sufficient water in any part of the buoyed channel, which was there about 2,000 feet wide. The Buffalo was an iron steamer 400 feet long, and drew 27.1 feet. She came down the usual course of deep draft vessels, in the westerly half of the buoyed channel, a little to the east of the line of the Chapel Hill range prolonged, which is much to the west of mid channel. When she signaled the Sea King, she was overtaking and a little lapping the stern of the still larger steamer Pretoria, drawing 31½ feet and about 200 feet to the westward of her and going through the water at the rate of about eight knots on a parallel course with the Buffalo. The latter, previously going about nine knots at half speed, after signaling, slowed, but still gained on the Pretoria until her bows came abreast of the Pretoria's bridge. She stopped her engines before coming abreast of the Sea King, and when abreast of the first barge reversed, but too late to avoid the Spring.

As respects the sheer described to each vessel, I am quite satisfied that no such sheer was the proper cause of the collision on either side. There is not the least probability that any sheer to the eastward was made by the Buffalo. It is testified to by the three witnesses on the Sea King alone, who were not in a position for most correct observation on this point; no such sheer was seen by the two witnesses on the Spring, who were in the best position to see it, if made; nor by the pilot of the Pretoria, who was nearest to her at the time; it is denied by all of the Buffalo's officers; there was no possible motive for such a sheer; and as the Buffalo was reversing at that time and was a right-handed propeller, any change of her heading must have been to the westward rather than to the eastward.

As respects the sheer of the Spring's stern to the westward, her two witnesses admit that her helm was put hard a-port at about the time the Buffalo was abreast of the Carleton, the barge ahead; but this would not have been material had not the barge and the steamer already come into very dangerous proximity. The tug and the Carleton were headed at that time at least two points off to the eastward of the channel course and were therefore pulling the Spring off in that direction, though that effort was soon relaxed, as hereafter explained. The port wheel in directing the stern of the Spring more to port would doubtless tend to throw her stern towards the Buffalo, while her bow would run to starboard; but the Spring's witnesses say that this set of the stern to port would be offset by the forward motion in turning off two points to the eastward; no other experts testify directly to the contrary; and although I have not sufficient data for making any exact theoretical computation not knowing the rate of rotation of a loaded barge in tow on a hawser under a port wheel, such analogies as I know forbid the conclusion that there would result any material net westward swing of the stern from a port wheel under such circumstances as here exist. The tow's heading two points to the eastward would itself and independently of any port helm carry her stern more than fifty feet to the eastward with every advance of a length; and this rate would be increased after the heading of the stem was brought more to the eastward by the port helm. This rate of drawing off is greater, I think, than any probable swing towards the Buffalo; so that although I cannot find positively on this point, I think the port wheel by the barge was probably a proper maneuver, in no way contributing to the collision.

All the witnesses, moreover, agree that the Carleton was from 150 to 200 feet distant when she passed abreast of the Buffalo, and no swing to that extent could possibly have been caused by a port wheel in advancing only about 100 yards. I have no doubt, therefore, that at least the Carleton's hawser, like the Carleton herself, was tailing two or three points towards the westward of the Buffalo's heading, as, indeed, most of the witnesses testify; so that, whether the Spring had already swung in line or not, the Buffalo's heading, when abreast of the Carleton, was very nearly directly upon the Spring. This is the positive testimony of the Spring's two wit-

nesses, **and is** the reason they give for their hard a-port wheel. This testimony is further confirmed by one or two passages in the **testimony of** McDonald, the **Buffalo's** pilot.

"Q. When you gave the order to stop and hard a-port where was the barge Spring? A. She was about ahead of me then.

"Q. What do you mean by ahead of you? A. I could see both sides of the Spring, her stern on one side and her bows on the other; that is, just overlapping.

"Q. Was the Spring ahead of your course? A. Yes; her bow was."

Other passages in this witness' testimony are inconsistent with this situation; and there are so many inconsistencies in his testimony that I cannot rely much upon it.

The master of the Buffalo says that the Spring, before her "sheer," was heading about on a parallel line with the Buffalo's heading; but he does not say how much, if any, to the eastward of his course the Spring was at that time. The Buffalo's witnesses in general say that the Spring, prior to her sheer, had not ported to go off to the eastward, as the tug and Carleton had done. The pilot says:

"Q. Did they keep going to port? A. They kept going to port; that is, the first barge and the towboat; not the second one.

"Q. The second one did not go? A. No, he did not go to port."

Upon this testimony of the master and pilot of the Buffalo, the situation would be such that while the Spring was heading more nearly up the channel course than the Carleton and tug were heading. her hawser would be leading about 2—3 points to the eastward of the Buffalo's course to the stern of the Carleton. This lead of the hawser would necessarily result from the Carleton's previous turn eastward, following the tug; and if the Carleton was but 170 feet distant from the Buffalo when abreast of her, the Spring's stern, 70 fathoms behind the Carleton, would be directly ahead of the Buffalo and her stern overlapping, as the pilot states. The Buffalo was heading, however, like the Pretoria (S. x W.) at one-quarter of a point to the eastward of the exact range course, which, according to the chart is S. x W. ¼ W. Her heading may have been in fact a little more than one-quarter of a point to the eastward as immediately after collision it was noticed to be S. ¾ W., i. e., half a point more to the southward, notwithstanding her prior reversing and westward sheer. Some easterly heading from the exact range course was necessary, in order to counteract the westerly set of the tide. This easterly heading, whatever it was, would increase the angle of the crossing courses, and the consequent rate of approach of the barge and steamer, even if the situation were that contended for by the steamer, as above stated; although, as I have said, the opposing witnesses testify that the Spring was tailing directly astern of the Carleton and the tug at the time when she ported.

The situation, on either contention, therefore, was in my opinion such as needs no sheer by either vessel to account for the collision. There was a westward set of the tide, which, not being sufficiently counteracted by the Sea King, had gradually set the tug and tow to the westward from the time they left the Swash Channel, two-thirds of a mile below, until the Spring had sagged over to the line of the Buffalo's course (the latter being necessarily headed a little to the eastward), and the Buffalo did not fully stop before the Sea King had pulled the barge away.

1. The Sea King is in my judgment primarily to blame for this result; because she did not keep her tow in the easterly half of the channel, as required by rule 25. The place of collision in the channel is indeed controverted; but the weight of evidence on that point seems to me clearly against the Sea King. The place of the wreck was exactly marked by triangulation, under the direction of the lighthouse board, as having Norton's Point light bearing N. E. ¾ N.; the Elm Tree beacon, N. W. ¼ N.; and Old Orchard Shoal light W. x S. ¾ S. These bearings were sworn to by Capt. Matthews, who took them. I have carefully compared them with the chart and find that they show the wreck to have been very nearly as marked on the Buffalo's Exhibit A, viz., about 400 feet east of the line connecting black buoy No. 9 with the bell buoy next above, on the west bank. The government chart with a star

added upon it, marking the place of the wreck, is not verified by any witness; and as there are no other data for placing the star than the triangulation above stated, the star can only be regarded as designed to conform to that. On trial, however, I find that the two northerly bearings from the star are erroneous by from one-eighth to three-sixteenths of a point, making the star too much to the eastward by about 400 feet. The libelant's witness Beebe, moreover, places the wreck only 150 feet easterly from the line of the Chapel Hill range course; whereas the star is from 500 to 600 feet easterly of it. That range course prolonged runs about 350 feet east of the black buoys on the westerly side of the channel; so that Beebe's location of the wreck agrees very nearly with the results of the triangulation, making it only 400 to 500 feet easterly from the line of the black buoys on the westerly side of the channel. In that position vessels of 29 feet draft could go west of it in the flood tide, as Beebe states.

The collision itself must have been but very little to the eastward of the wreck. The witnesses who speak of it say the Spring sank very near the place of collision, and within three or four minutes afterwards. It was directly astern of the Buffalo, as she drew to the southward. The Spring at collision was heading nearly N. E. and was going about 4 or 5 knots. Her stern was doubtless turned somewhat to the southward by the collision; but she could not at first have got headed much to the westward, inasmuch as she passed for 400 feet along the easterly side of the Buffalo, which must have been fully stopped before the Spring reached her stern; and when sunk the wreck headed only 1½ points west of north. An allowance of a change of 200 feet to the westward between the place of collision and the place of the wreck, would be considerably more than anything in the testimony would warrant; so that I cannot place the collision over 700 feet at most (agreeing with Wall's estimate) from the line of the black buoys on the westerly side of the channel. The whole width of the 24 feet channel from the westerly to the easterly line is about 2,000 feet. The Spring was, therefore, at least 250 or 300 feet to the westward of the extreme limit of her rightful water under rule 25.

There were no circumstances to excuse the Sea King from keeping the tow on the right-hand side of mid channel. The greatest draft of the tug and tow was 19½ feet. They had about 1,000 feet in width in the easterly half of the buoyed channel way of 24 feet depth, and a considerable additional space of available water to the eastward of over 19 feet. There were no other vessels in the way. The only explanation that can be surmised of the Sea King's course is, as above observed, that sufficient account was not taken of the westward set of the tide, proper observation employed, nor timely means to avert, the westward drift. Her witnesses say that they rounded the red bell buoy at the upper end of the Swash Channel within 50 or 100 feet of it; and if so, their westward drift was all the more noticeable in getting 1,000 feet to the westward and beyond mid channel in going about two-thirds of a mile beyond that buoy. The course which the master says he took on rounding the buoy was N. x E. ½ E. This was but a quarter of a point east of the direct course up the channel. That was perhaps enough for a tow or vessel going 8 or 10 knots through the water, but not enough for one going but 4 to 5 knots.

The master says that on signaling, he ported two points; but the wheelsman on cross-examination says that porting was not commenced until the Buffalo was within one-fourth of a mile, and was so gradually done that the tug was not headed two points to the eastward until the Buffalo was abreast of the tug; and that after she had passed the tug, he hauled again to his former course, though the master, who at that time was aft, denies this. However it occurred, this sagging to the westward was the fault of the Sea King, as she had ample means to prevent it.

2. At the porting of the Spring the Buffalo was no doubt moving at the rate of 3 or 4 knots; both were within 200 or 300 feet of the point of collision, which must have occurred within one-half minute after. The Buffalo appeared to be heading straight for the Spring. The situation had become critical; and if porting was an error, which I doubt for the reasons above stated, it was not a legal fault. The blame is in bringing about that situa-

tion. **Nor do I** see how porting earlier, which must have caused similar changes of position in the Spring, whatever these changes were, could have made any material difference to the Buffalo. I hold the Spring, therefore, not to blame.

3. The chief embarrassment in the case I find, as usual, as respects the alleged fault of the other vessel. All agree that fault in vessel A. does not justify vessel B. though she has the right of way, in running into A. when B. might avoid her by reasonable prudence and skill. The difficulty is in the application of this principle. Here the Buffalo was in her proper part of the channel. She had the right of way there, and she had the right to expect that the Sea King would keep her tow in her own half of the water. The Spring was in effect negligently allowed to drift under the Buffalo's bows, while the Buffalo did not in fact stop, as she might doubtless have done, in time to avoid the Spring, which had sagged in her way. It is a question of the Buffalo's notice of danger; and of what she had a reasonable right to expect that the Sea King could and would do to keep the Spring away. If there was no reasonable ground of apprehension, or if she had the right to expect that the Sea King would draw the tow away, up to the time when collision could no longer be avoided by the Buffalo, then she is not to blame. The Mary Powell, 34 C. C. A. 421, 92 Fed. 408.

There is no doubt that the Buffalo had notice of whatever danger there was, up to the time she came abreast of the tug. The tow had been plainly sagging to the westward. Instead of keeping its distance and gradually broadening off as it approached, the tow, as the Buffalo's pilot says, "kept all the time closing in on us, until the Spring was about ahead." The Buffalo had added to the danger by running up partly abreast of the Pretoria, so that she could not turn to the right or left except for a few feet. The Buffalo had, however, previously slowed for one or two minutes, turned towards the Pretoria as near as was safe, and then stopped her engines, so that the Pretoria was slowly drawing past her. The Sea King, a tug of ample power, was seen to be turning more to the eastward, and would naturally soon pull the Spring out of the way. In that situation it was the Buffalo's duty to give the Sea King reasonable time to do so by reversing as soon as it was apparently necessary. Contrary to my first impressions, I must find upon the evidence that the Buffalo did so.

All agree that the tug and first barge passed the Buffalo at a reasonable and safe distance, estimated variously at from 200 to 400 feet, giving rise to no apprehension whatever. All also agree that the distance of the first barge on passing was about the same as that of the tug, or only a little nearer. From the latter fact, which is nowhere disputed, it necessarily follows, that while the Buffalo was moving from abreast of the tug to abreast of the first barge, the latter was pulled over to the eastward nearly as much as her previous tailing to the westward; and as the Buffalo was moving forwards, this could only have been done through a more easterly sheer of the tug about that time, which agrees with the wheelsman's testimony; so that the line of the whole tug and tow was probably somewhat convex on the side of the Buffalo. The evidence on this point is not as explicit or consistent as could have been desired.

But if the tug in the interval between her and the first barge almost wholly overcame that barge's westerly tailing towards the Buffalo by her hauling to the eastward, so that the first barge was 150 or 200 feet distant on passing. the Buffalo had a right to expect that the same easterly pull would be continued by the tug, and that the Spring, which was astern of the Carleton by a similar interval, would pass at nearly the same distance as the Carleton. The time available for hauling the Spring off to the eastward was greater, since the Buffalo's forward motion, with her engines stopped, was constantly diminishing; and this additional time was in fact considerably further increased by the Buffalo's reversal when abreast of the Carleton, in consequence. it is said, of seeing the Spring port her wheel. Why the Spring was not hauled away as the Carleton had been, is explained by the wheelsman of the tug, who testifies that while the master was aft he starboarded. and resumed the former course of N. x E. ½ E. after passing the Buffalo and before collision, without the master's knowledge.

"Q. How long did you carry the wheel aport, until you came back to the old course? A. Till she [the Buffalo] had just passed us. Her stern was abreast of us, thereabouts; then we starboarded, and put her on her course again * * * her old course, N. x E. ½ E. * * * The captain was aft then. He did not tell me. I knew enough for that myself. We were just about on that course at the time the collision occurred * * * steadied before collision."

Thus the tug's pull to the eastward was prematurely stopped, and the Spring's stern, which was "overlapping" to the starboard side of the Buffalo when 500 feet away, was not hauled clear, as it doubtless would have been had the tug's course two points to the eastward been continued as it ought to have been. The Buffalo could not have foreseen or anticipated this last false maneuver of the tug, and the Buffalo in no way induced this false maneuver. But for that, the Buffalo's measures would have been sufficient to avoid the Spring, and the whole blame must, therefore, rest upon the Sea King.

Decree accordingly.

Le Roy S. Gove, for the Sea King.
James E. Carpenter, for libelant.
Harrington Putnam, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. Affirmed, with interest and costs, on opinion of court below.