THE HORTENSIUS. THE ROBERT W. PALMER. THE EASTMAN NO. 2.

(District Court, S. D. New York. December 7, 1909.)

COLLISION (§ 64*)—EVIDENCE—NEGLIGENCE.
  Collision near the West Bank Light, New York Bay, between the steamship Hortensius and a scow in tow on a hawser of the tug Palmer. Held that the scow was properly lighted and the collision was the result of fault on the part of the Hortensius in not having a proper lookout and on the part of the tug in not keeping her tow on the starboard side of the channel.

  [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 81, 82; Dec. Dig. § 64.*]

(Syllabus by the Judge.)

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Actions by Franklin P. Eastman and others against the steamship Hortensius and the tug Robert W. Palmer, and by the British & South American Steam Navigation Company, Limited, against the scow Eastman No. 2 and the tug Robert W. Palmer, to recover for a collision. Libel against the scow dismissed. Decree in favor of Franklin P. Eastman and others against both vessels, and libel of the British & South American Steam Navigation Company sustained.

Wing, Putnam & Burlingham, for the scow.
Convers & Kirlin, for the Hortensius.
Wallace, Butler & Brown, for the Palmer.

ADAMS, District Judge. This action was brought by Franklin P. Eastman et al., the owners of scow No. 2, against the steamship Hortensius to recover the damages, alleged to have been $8,000, caused by a collision between the scow and the steamer on June 5, 1908, about 10:45 p. m., just above the West Bank. The tide was flood, the wind fresh from the eastward and the weather clear.

The further allegations of the libel are that the scow was bound into New York, after having dumped her load of street sweepings, in tow, on a hawser of about 200 fathoms, of the tug Robert W. Palmer; that the tow was coming through the Swash Channel at the rate of about 4 miles an hour by the land; that in passing the bell buoy the tug headed up the Main Channel keeping to the eastward of mid-channel and carrying the Conover Beacon and Chapel Hill Beacon range lights a little on her port quarter; that while proceeding thus, the Hortensius was sighted coming down the Main Channel a little on the tug's port hand, showing her green light; that the Hortensius blew a signal of one blast which the Palmer answered with one blast, and both vessels ported their helms; that the green light of the Hortensius was shut in and her red light came into view; that the two vessels kept on, the Hortensius passing the Palmer well clear port to port; that instead of keeping on her course, the Hortensius sheered to the eastward and struck the scow a head-on blow breaking the bunker log and doing other serious damage; that by the collision the hawser was parted at the bridle. It is then alleged that the collision was not caused by any negligence on the part of the libellants or those in charge of the scow but was due to the negligence of the Hortensius in that: (1) the steamship was not under the command of a competent person, (2) she did not keep a good lookout, (3) she did not keep on the starboard side of the channel as required by Article 25 of the Inland Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 327 [U. S. Comp. St. 1901, p. 2870]), (4) she undertook to make a close shave, (5) after passing the tug she sheered into the scow, (6) she did nothing to avoid a collision and (7) she did not stand by as required by the Act of Congress.

The claimant of the Hortensius, after some admissions and denials, alleged:

"Third: It alleges that the facts with regard to the collision are not fully and correctly set forth in the third article of the libel herein but that they are as follows:

On the evening of June 5th, 1908, the steamship Hortensius was proceeding from her pier at Atlantic Dock to sea. After leaving her dock at or about

6:30 o'clock p. m., she came to anchor off the Statue of Liberty, awaiting her papers. After they were received, she got under way again and started for sea shortly after 9 o'clock.

At that time and up to the time of the collision, the steamship Hortensius was seaworthy and in all respects properly equipped and ready for her voyage, and at all times she was properly officered and manned, had a careful and competent lookout stationed on her forecastle head, and was in charge of a duly licensed full branch New Jersey Sandy Hook pilot.

After leaving her anchorage off the Statue of Liberty, and making the Main Channel, the Hortensius steered down the channel course, keeping well to the westward of the range lights. When she was off the West Bank bell buoy No. 9½ which she had passed well to the westward of the range lights, a tug and tow were sighted standing up the harbor and bearing on the port bow of the Hortensius. The Hortensius thereupon blew a single blast whistle signal which was answered by the tug. The tug proved to be the Robert W. Palmer, with the scow Eastman No. 2, for damage to which this libel was brought, in tow astern on a long hawser.

The Hortensius after blowing the signal changed her course a little to the westward and slowed her engines, the tug passing her on her own port side. It was then observed that the lights of the tow were being carried around to the westward by the wind and tide and were getting on the starboard bow of the Hortensius. These lights got over to the westward of the range lights and on the westerly side of the channel. The engines of the Hortensius, which had been slowed down when the tug was passed, were at once put full ahead to get better steerage way and the helm was put hard aport in order to attempt to sheer clear of the scow. Almost immediately after the order to start the engines ahead was given, the pilot finding that a collision could probably not be avoided in that way, had the engines put full speed astern. The wheel was left still hard aport and a three blast signal was blown on the Hortensius' whistle to indicate that her engines were going full speed astern. The engines had been going full speed astern for a period of about two minutes and the Hortensius had practically stopped in the water when the scow came in contact with her.

The scow struck the Hortensius almost squarely on the bow, the stem of the Hortensius striking the scow slightly inboard of her forward port corner. Considerable damage was done to the Hortensius by the collision.

At the time of the collision, the Hortensius was dangerously near the shallow water on the western side of the channel and it was necessary to exercise extreme care in order to round West Bank Light to the eastward. This was done and then the Hortensius turned and stood by to ascertain that the tug and tow were safe, and after having done so proceeded to an anchorage off Gravesend Bay.

At the place and time of the collision, the night was fine and clear, the wind was blowing freshly from a point about east by south and the tide was about half flood and running in a general north-westerly direction.

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*

Eighth: Further answering herein, the claimants allege that the steamship Hortensius at all the times mentioned was fully and properly officered, manned and equipped and was in all respects tight, staunch and seaworthy, and the collision referred to was not caused by nor contributed to by any fault or negligence on the part of the steamship Hortensius, her owners or anyone for whom she or they may have been responsible. The scow Eastman No. 2, as the claimants are informed and believe, had no rudder and no means of directing her course on the occasion of the collision. She was practically at the mercy of the wind and tide and her direction depended largely on the sheer which the course of her tug, taken in connection with the other forces operating on her, might give her. Consequently, the towing of her by the tug Robert W. Palmer on a long hawser of upwards of 200 fathoms was improper and constituted a serious menace to navigation in crowded waters such as those of New York Harbor.

The collision was caused by or contributed to by the fault and negligence of the tug Robert W. Palmer and to the inefficiency and negligence of her master, officers and crew and those in charge of her: 1. In not keeping a proper look-

out. 2. In using a tow line much too long for the towing of a scow without steering gear. 3. In not keeping her tow on the starboard side of the channel as required by the rules. 4. In towing a light scow without steering gear astern on a hawser instead of abreast of the tug. 5. In making too long a sweep in turning into the Main Channel in view of the nature of the tow which she had and her manner of towing it. 6. In having no efficient means of casting the scow adrift in case it became necessary. 7. In that she did not cast the scow adrift when it was seen that there was danger of collision. 8. In that there was no efficient means of communication between the tug and tow. 9. In that the tug did not communicate with the tow or sound any warning signals to the steamer. 10. In that the tug did not make any effort to avoid the collision. 11. In other respects which will be shown at the trial of the cause.

Ninth: Further answering herein the claimants allege: The collision was also caused by or contributed to by the fault and negligence of the scow Eastman No. 2 and to the inefficiency and negligence of her master, officers and crew, her owners and those in charge of her:

1. In not keeping a proper lookout. 2. In permitting the scow to be towed in on a hawser which was much too long, and in a manner which they knew or ought to have known would be dangerous to other vessels, because the scow had no steering gear, and in other respects which will be shown at the trial."

The claimants then petitioned the Palmer into the action, alleging that she was in fault as above.

The owners of the Hortensius then filed a cross libel against the scow and the tug, alleging the facts as in their answer and asking for a recovery of their damages, said to be $3,500.

This cross libel was duly answered by the owners of the scow and of the Palmer.

The officers on the bridge of the Hortensius claim that the scow had no lights, but that she was duly displaying proper lights is shown by practically all the other witnesses in the case, including the lookout on the Hortensius, who said he saw them some little time before the collision but did not report them because he assumed that those on the bridge had also seen them.

The scow was a side dumper, about 134 feet long, 34 feet wide and with 14 feet depth of hold. She had no steering gear or motive power but had two skags or stationary rudders, one on each side of her stern, the object of which was to steady her. She was struck on her square bow which was cut into within a foot of the water line.

The scow was in tow of the Palmer on a long hawser, about 175 fathoms, but she was under the Palmer's control in such respect, as well as others, and no fault having been shown on her part, her owners are entitled to their damages.

## The Hortensius.

The Hortensius was a steel screw steamship 363 feet in length, her beam was 47 feet and her depth of hold 25 feet. She was bound on a voyage from New York to the River Plate and in charge of a Sandy Hook pilot. She left her pier at 6:30 p. m., drawing at the time 24 feet of water. She came to anchor below the Statue of Liberty, where she remained until 9 p. m., and then proceeded down the bay. A lookout was stationed forward and the wheelsman, the third officer and the captain and pilot were on the bridge. When the steamer passed the Craven Shoal, three tows were noticed coming up the bay, the tugs

of which were showing three mast head lights. One of these tows was passed to port off Swinburne Island. The other two, the Hallenbeck's tow and the Palmer's tow, came shortly after, the former being ahead. The Palmer was seen turning into the Main Channel from the Swash showing a green side light. At this time the Hortensius blew one blast to the Palmer, to which the latter replied with a signal of one and ported, shutting out her green light and showing her port light. Both of the tows were extending somewhat across the channel. The tail of the Hallenbeck's tow was about the center of the channel, while the tow of the Palmer was more to the westward as the latter was overtaking the former, going about 3 knots an hour, while the latter, being lighter, was making about 4 knots per hour. After the exchange of signals the Hortensius slowed. It is claimed that the scow in tow could not then be seen, even with marine glasses, and the slowing was a precautionary measure. Previous to the slowing, the speed of the steamer was about 8 knots and the slowing was equivalent to half speed, or perhaps not more than 3 knots. The tide at this time was setting about northwest, and together with a fresh easterly breeze, had the effect of swinging the tow to the westward. The Hortensius kept well to the westward side of the channel. The scow was first discovered by those on the bridge of the steamer when she was a short distance, 700 or 800 feet away, and it is claimed, the lights of the scow were then discovered at the same time as the scow herself. The steamer's helm was put hard-a-port and the engines put full speed ahead in order to cause her to swing quickly. This speed was maintained for about a minute but the pilot saw she was not going to clear in that way, so he ordered the helm to starboard and had the engines reversed at full speed, and as the reversing was a couple of minutes before the contact, the steamer's headway was practically overcome, her back water being nearly as far forward as the bridge. The tow continued to advance, and at the time of the contact was going forward at some speed, probably, as aided by the tide, at the rate of 5 or 6 knots. The collision occurred at a point above the West Bank Light, on the westerly side of the channel, perhaps 300 or 400 feet from the westerly bank.

It is urged that the Hortensius was in fault for not standing by the tow, and in proceeding some 3½ miles down the channel before she turned back, but she saw that the tug was returning to the tow and I fail to find any condemnatory action in this respect.

I think, however, that the Hortensius was in fault in failing to see the scow much sooner than she did. That the scow could have been seen is obvious from the fact that her lights were properly displayed and seen by the steamer's lookout but not reported by him as stated above. He said he saw the scow's lights before the steamer blew her signal of one blast and heard those on the bridge talking about them before he left it. Even if there was no such conversation, a proper observation from the bridge, upon a report being made, would have shown the barge on the westerly side of the channel, requiring care on the part of the Hortensius in stopping sooner to allow it to be pulled out of the way. This duty she failed to perform and it was undoubtedly a cause of the collision. Apart from the obligation to see the

scow's lights, the tug's three towing lights, advising the steamer that the tug had a tow astern more than 600 feet in length, were seen, and should of themselves sufficed, in view of the wind and set of the tide to cause the steamer to proceed with more caution than she exercised. The pilot said that he would not have been able to avoid the collision by stopping and reversing as it would have caused the steamer to be carried ashore on the western bank but that does not seem probable. Perhaps there would have been some reason for such an apprehension if the steamer had remained motionless in the water for any length of time, but there was no apparent necessity for that. If she had slowed sooner than she did she would doubtless have been under such command that a stoppage, even if necessary, could have been made without danger. The master of the steamship, who was also on the bridge, stated that the cause of the collision was the failure to see the lights. He said when they went astern it was—

"too late to avoid collision. If the lamps had been seen there would have been no collision * * * We would not have proceeded on so far, we would have been going full speed astern long before we ever approached the lights."

### The Palmer.

The Palmer had been out to the dumping grounds with her tow. When coming in, the tide was flood and the wind fresh from the eastward. After rounding to the west of the bell buoy which marks the junction of the Swash Channel and the Main Ship Channel, she changed her course so as to reach buoy No. 10. She was drawing 10 or 11 feet of water and the scow about 3 or 4 feet. The master of the Palmer, who was at the wheel, saw the white light and the green light of the Hortensius just before the latter turned down from Craven Shoal. The steamer then shut out her green light and showed her red light. The tug at the time was showing her light to the steamer. At this time the signals to pass port to port were exchanged. The tug ported her helm and hauled to the eastward but made no change in her speed. The Hallenbeck with her tow was then on a similar course to the Palmer's but inside of the latter. The Palmer took a course to the westward of the Hallenbeck's tow, and was gradually passing it, without change of speed, which was not made until after the collision took place, when the Hortensius and the scow came together.

The principal charge of fault against the tug is towing with such a long line. It has been held that while there is no rule or regulation prohibiting the use of such long hawsers, yet the courts have said it is a dangerous practice and that tugs using it will be held to a strict accountability in case of disaster. In the Circuit Court of Appeals in The H. M. Whitney, 86 Fed. 697, 700, 30 C. C. A. 343, 346, it was said, quoting from The Gladiator, 79 Fed. 446, 25 C. C. A. 33:

"While * * * we can not condemn a tow of the character of that in this case as absolutely unlawful, yet we must hold tugs which navigate this coast with such long and essentially hazardous fleets to the use of the extremest care in the interests of common safety."

Here the Palmer took no especial care to avoid the steamer. Under the effect of the easterly wind and the set of the tide, it should have

been evident that the tow would take a considerable sheer across the channel. It was therefore impossible for the Palmer to draw the tow sufficiently to the eastward to pass safely, and she should have taken some measures to avoid blocking the channel, as by stopping and permitting the Hallenbeck's tow to go on, in which case, having reduced her speed, she could have drawn in behind the Hallenbeck's tow to the eastward. Some measures should have been taken on the Palmer's part to avoid the effect of the western drift and she was evidently in fault for not adopting timely measures for that purpose. The Sea King, 114 Fed. 535, 52 C. C. A. 349. She was evidently not entitled to occupy practically the whole channel with her tow but should have kept it on the starboard side under Rule 25, and there is nothing in the case to show that it was not safe and practicable for her to do so. The agreement by signals meant that the tug would keep her tow to the right and if she were not going to be able to do so, she should have signified it by alarm whistles and not have consented.

The libel against the scow is dismissed. There will be a decree in favor of Eastman et al. against both vessels, with an order of reference. The libel of the British & South American Navigation Company is sustained for half damages, with an order of reference.