## PENNSYLVANIA R. CO. v. MAGEE.

(District Court, E. D. New York. May 17, 1910.)

1. COLLISION (§ 90*)—RULES—NARROW CHANNEL RULE.

The narrow channel rule (article 25 of the Inland Rules; chapter 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), requiring steam vessels navigating narrow channels when safe and practicable to keep to that side of the fairway which lies on their starboard side, is not strictly applicable to the passage around the Battery from the East to the North River, but still should be respected by boats passing around the Battery, especially from the North River, when they would otherwise interfere with vessels coming down the East River rightfully on the west side of the channel.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 90.*]

2. COLLISION (§ 95*)—STEAM VESSELS—FAULT.

The ferryboat Long Beach was passing around the Battery from the North River and stopped to permit a lighter to pass on her starboard side. At the time the tug Powhatan with a tow on her side was coming down East River and to pass around the Battery, being outside of three other tugs with tows which were as close to the New York piers as they could safely go. While so stopped, the ferryboat gave the Powhatan a signal of one whistle, which was answered, and she then started ahead; but, instead of keeping across toward the Brooklyn side so as to pass under the bows of all the tugs, she attempted to go to port to pass between the Powhatan and a tow which was in mid-river and came into collision with the Powhatan, which had stopped when the danger became apparent. *Held*, that neither the narrow channel rule nor the starboard hand rule for crossing vessels fully governed the situation, but that the ferryboat was solely in fault for not keeping to starboard, which it appeared she could have done, while the tug did not have room to go further to starboard.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200-202; Dec. Dig. § 95.*]

In Admiralty. Suit by the Pennsylvania Railroad Company against John Magee, Jr. Decree for respondent.

Robinson, Biddle & Benedict (E. G. Benedict, of counsel), for libelant.

William J. Youngs, U. S. Atty. (Selah B. Strong, of counsel), for respondent.

CHATFIELD, District Judge. On the afternoon of June 11, 1908, the United States tug Powhatan left the New York Navy Yard, a short distance above the Brooklyn Bridge, and proceeded down the East River, with a barge called the "Canister" in tow on her port side. After passing the Brooklyn Bridge, the Powhatan crossed over to the starboard side of the channel, and assumed a position outside of three other boats with tows headed in the same direction and proceeding at substantially the same speed, thus passing what is known as "Pier 5" in the East River about halfway between the Wall street ferry and the Battery, with these four craft abreast and so close together that none of them could proceed further to the starboard without collision. The inside boat was just off from the pierheads, and the positions which they maintained were necessitated by the presence of a tow of canalboats and also by the ferryboat of libelant, operated on a course from Jersey City to Brooklyn. This ferryboat was rounding the Battery, at a distance estimated by her own captain as 500 or 600 feet from the pierheads. At the time she was sighted by the boats above referred to, she was stopped on a course substantially parallel to a tangent to the pierhead line off the Battery, and nearly opposite the slip used by the Staten Island ferry. She had previously brought her engines to a stop upon receiving a signal from a steamlighter which had come down the East River on the Brooklyn side, but was then rounding the Battery toward the North River at a considerable rate of speed against the tide, and in such a position as to pass the ferryboat to starboard; a two-whistle signal having been exchanged with the ferryboat.

Another factor in the situation was what is called the "Albany tow"; that is, a string of canalboats being made up opposite the Wall street ferry, in the East River, and headed toward Governor's Island, but under just speed enough to counteract the flood tide which there runs up the East River.

The captain of the ferryboat testifies that the Albany tow was considerably below the Wall street ferry and was moving down the river. But in view of the object which this tow had in mind in maneuvering in that part of the river, and the testimony of the various witnesses upon other boats who are extremely positive in their statements, it would appear that the ferryboat could have safely crossed the bow of the tow and passed it to port after the lighter had gone on into the Hudson river. The captain of the ferryboat testified that after lying still during the passage of the lighter, he gave the signal to the engines of the ferryboat for full speed ahead, and proceeded in a direction substantially across the East River toward the Brooklyn slip of the Wall street ferry and across the bow of the Albany tow, but

that he was compelled immediately to starboard his helm and pass to starboard of the Albany tow; that is, on the New York side of the river.

In this he is contradicted by the captains of the boats coming down along the shore, who all agree, so far as they saw the ferryboat's course, that the ferryboat should have proceeded straight ahead and to port of this tow. This tow, therefore, should have had no effect upon the movements of the ferryboat relative to that of the four craft coming down the river.

It appears from the evidence that the ferryboat in question was not the one usually used for this service, but was a much heavier and longer boat, and it can be assumed that it neither responded to the helm as quickly nor got under way as rapidly as the smaller boat, and it is very probable that this difference may have prevented the ferryboat from turning and passing safely through a space which would have been sufficient for the usual boat.

The ferryboat claims to have blown one whistle to the Powhatan. The Powhatan blew one whistle which the ferryboat understood, and all the various craft inside the Albany tow were in clear view of the ferryboat at the time of this exchange of signals. It further appears that neither the Powhatan nor any of the three boats between her and the pierhead was then able to move to starboard, and a reversal of the Powhatan's engines, when it was seen that the ferryboat was not likely to get under way with sufficient quickness to avoid being carried by the tide to port and into the path of the Powhatan, was too late to prevent a collision between the forward port corner of the Canister, which was a square-nosed barge, and the paddle wheel guard upon the port side of the ferryboat. An abrupt turn on the ferryboat's part under a starboard helm swung the ferryboat alongside of the Canister and caused the carrying away of the guard to the paddle-wheel house and certain injuries to the wheel and shaft; but by this movement further penetration into the ferryboat and more serious consequences were probably avoided.

The respondent was the pilot of the Powhatan, and has been sued in personam for his own actions, inasmuch as he is shown by the testimony to have been entirely responsible for her movements.

It is contended on his behalf that the Powhatan at this time was entitled to at least one-half of the channel, under what is known as the "narrow channel rule" (chapter 4, art. 25, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which has been many times held applicable to general navigation in the actual narrow channels in the Bay of New York (The Sea King, 114 Fed. 535, 52 C. C. A. 349), but not to the North River or the Upper Bay (The Islander, 152 Fed. 385, 81 C. C. A. 511; The Bee, 138 Fed. 303, 70 C. C. A. 593).

If we are to consider the passage from the East River around the Battery into the North River as but one continuous strait or channel, strict enforcement of this rule would require a boat coming from the North River and turning around the Battery into the East River to keep some 1,200 or more feet from the New York shore; that is, to make the turn upon the Governor's Island side of the channel. In

the same way it would be necessary for any boat passing through these waters to cross the other lines of traffic and go far out of the way, with no gain from the standpoint of safety. The chart shows that the distance between the Battery and Governor's Island is some 2,400 feet, with a minimum depth from shore to shore of 21 feet. The Battery shore is lined with ferry slips and piers, and the ferryboats coming in and out of these slips render navigation close to the pierheads extremely dangerous, and at the same time cause great congestion when craft, attempting to pass in either direction, follow converging paths and are stopped by the crossing of so many ferryboats.

It is evident that an exact application of the narrow channel rule cannot be made. The place in question, while narrow, is but a crossing or connection between four channels of extremely different widths and forms.

But even if the narrow channel rule be not wholly applicable, it may still be respected by a boat passing directly around the Battery; that is, from the North River to the East River, or from the East River to the North River. In this regard, the Bay and Buttermilk Channel side of the passage can be eliminated, and it is evident that a boat rounding the Battery within dangerous proximity of the pierheads would not only be violating the rules laid down by the courts in such cases as have been referred to, but would be in an entirely indefensible position if by its course it offered an obstruction to craft coming down the East River upon the proper or starboard side of that channel, which passes around the Battery upon the New York side.

Hence, assuming that the space for craft rounding the Battery, which could be made subject to the narrow channel rule, be the portion of the waters occupied by craft pursuing their rightful courses in the East River, and giving room to craft which they might meet headed up or down, it would be apparent that the Long Beach, if 350 feet from the Battery, or even if 500 feet away, when turning from the North River into the East River, would be so directly in the path of boats coming down the starboard side of the East River as to require her to give way and to take precautions for their safety, especially in view of the fact that their room for maneuvering to starboard was substantially interfered with by the various slips and the shape of the shore line, until a point more than halfway around the Battery had been passed.

On the other hand, a boat coming down the East River, in the position in which the Powhatan found herself, would certainly be compelled to follow a course which would cross that of any vessel coming east around the Battery, until the turn had been made sufficiently to make these courses parallel, or for the Powhatan to turn up the North River.

Under ordinary circumstances, a course at any given point is presumed to mean a straight line, and hence as the Powhatan came down the East River her course intersected that of the Long Beach at the time of the interchange of signals. The Long Beach must have been on the Powhatan's starboard bow, and the burden was upon the Powhatan to keep out of the way.

"Rule 8. When two steamers are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steamer is overtaking another, the steamer which has the other on her port side shall hold her course and speed; and the steamer which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed or stop or reverse."

Should a different rule apply to govern the movements of steamers which may be following what could be plotted as substantially parallel courses upon parallel curves? It would seem that even if the Powhatan had the right to rely upon the fact that her course was one rounding the Battery, and that the ferryboat's course was also around the Battery in the opposite direction, she could not insist on her own course, but must keep out of the way in the situation shown.

If no whistles had been blown, and if it were merely a question of what the vessels were bound to understand as to each other's movements and as to the way their paths should avoid each other, the narrow channel rule might be of some effect, and the ferryboat could not avoid any negligence on its part by which it put itself in the water belonging to the other boat, or by which it attempted to usurp the expected and in fact only possible course of the Powhatan. If the ferryboat had been proceeding steadily and had insisted upon a right of way around the Battery, solely upon the theory that she could call any vessel coming down the East River a crossing vessel, without reference to the whereabouts of the ferryboat herself or of the burden upon her to respect the needs of the down-coming craft upon the starboard side of the available water, the court would have no hesitation in holding the ferryboat responsible for an undue insistence upon a technical rule which common sense would indicate was not applicable to the precise locality. To this extent the position of the respondent must be vindicated, and his attempt to invoke the narrow channel rule is in that respect not far fetched. But in the actual circumstances shown in this case the ferryboat was not attempting to dispute with the Powhatan the right to any particular course, but was navigating with respect to the steam lighter which had the right of way around the Battery ahead of the Powhatan. The ferryboat actually exchanged signals with the Powhatan while she was lying still in such a position that the course of the two vessels could not but be considered as a crossing course, with the Long Beach on the starboard hand of the Powhatan at the moment in question.

But even under these circumstances, special conditions governed the situation.

The ferryboat did not respond and did not maneuver as quickly as the captain, who had been used to a lighter boat, evidently desired and anticipated that she would. But even this was something which the Powhatan was bound to take into account. To the pilot of the Powhatan the ferryboat Long Beach was in plain sight, and his duty was to so navigate as to give her an opportunity to pass across the bow of the Powhatan and to her port side. To this extent the starboard hand rule is applicable and the ferryboat had the right of way. But, again, special circumstances in this particular case come into the

situation. The captain of the ferryboat testifies (page 8) that he answered the two whistles of the lighter, while slowed down; that he then hooked his boat up and stopped until he cleared the lighter; that he then blew one whistle to the Powhatan, hooked his boat up again, and proceeded between the Powhatan and the Albany tow; that he was making straight for the opening between the two vessels. And again (page 10) that he was off the Staten Island ferry slip at the time of giving the signal to the Powhatan, that he was headed straight toward the Montague street slip in Brooklyn, and that before his boat had gained a position beyond the course of the Powhatan, the tide brought the ferryboat so far to the north that even with a violent sheer under a starboard helm, the corner of the Canister ripped along the port side of the ferryboat. The captain testifies that the steam lighter was passing the Albany tow when the ferryboat answered the lighter's two whistles, and that he had to alter his "course and haul up on the other side of the Albany tow and the New York docks, because I would have either had to cross his whistles or run into this tow, as there wouldn't be room for me to answer his whistles and pass between him and the Albany tow" (page 7).

The captains of the boats inside of the Powhatan, as well as the respondent, testify that the lighter passed the Long Beach off the Staten Island ferry, having blown a signal of two whistles to the ferryboat when abreast of the South Ferry.

There is no apparent reason why the captain of the Long Beach (unless he mistook the character of the Albany tow and assumed that it was moving down the river) was compelled to turn to port and to come up on the New York side of that tow. His testimony indicates that this was surely the course which he had in mind, and that he did not attempt to keep to the southward of the Albany tow and cross its bow to get up upon the Brooklyn side of the river. He stopped in order to let the lighter go by, at the very time that he was signaling to the Powhatan, and says (page 10) that "on blowing the whistle he immediately started ahead."

The pilot of the Long Beach says (page 29) that the Long Beach, after passing the lighter, straightened for Brooklyn before giving the one whistle signal to the Powhatan, and that a space of 200 feet separated the Powhatan from the Albany tow.

The engineer of the Long Beach says (page 32) that at 5:28 p. m. he received one bell to slow, under which the boat continued for half a minute, then came a bell for full speed ahead, continuing about one minute, then a bell to slow and one to stop; that they ran slow for about half a minute, when he received a bell for full speed ahead, and after about three turns a signal to stop and reverse, when the collision came, at about 5:30 p. m.

A strict construction of the starboard hand rule, so far as the Powhatan was concerned, might have required the ferryboat to remain still and not change her speed and distance, so that the Powhatan might pass to port if the Powhatan accepted the one-whistle signal. But in view of the evident situation, and it being apparent that the ferryboat could then proceed to port of the Albany tow, and as the

Powhatan accepted the one-whistle signal and assumed the burden of passing under the stern of the ferryboat and keeping out of her way, it would seem that the captain of the ferryboat should not have waited for an opportunity, or attempted to so maneuver his boat as to pass between the Powhatan and the Albany tow. If necessary, he should have assumed that the one-whistle signal would include even the Albany tow, and should have held a course and endeavored to assume a speed with his vessel which would carry him clear, in order that he might pass all of the vessels coming down the river on their port hand. If he had done this, there would have been no accident, and, inasmuch as neither the narrow channel nor the starboard hand rule is complete in its control of the precise situation, it must be held that the libelant has not sustained the burden of proof in showing that the respondent was guilty of any negligence in not anticipating that the ferryboat would attempt to pass between the Powhatan and the Albany tow; it being evident that the Powhatan could not maneuver further to starboard, and that she did attempt to stop and to reverse as soon as the actions of the ferryboat indicated what the ferryboat was trying to do.

The libel should be dismissed.