## THE PRUDENCE.

### THE DOROTHY.

(District Court, E. D. Pennsylvania. February 26, 1914.)

No. 38.

1. COLLISION (§ 95*)—TUGS WITH TOWS NAVIGATING CHANNEL—CARE TO PREVENT SWING OF TOWS.

Where a tug is towing on long hawsers, the highest degree of care is imposed on the tug and tows, in making turns in following a channel, to avoid injury to other vessels by the swinging out of the tows.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

2. COLLISION (§ 95*)—TOW AND ANCHORED VESSEL—NEGLIGENT NAVIGATION OF TOW—IMPROPER ANCHORAGE.

As a tug with two barges in tow on hawsers, the whole being 650 feet long, was moving up the Maurice river, near its mouth in the evening on a flood tide, and while passing to starboard around a bend, the last barge swung to port and came into collision with an anchored schooner whose lights had been seen for some time, and which was passed by the tug at a distance of about 200 feet. *Held*, on the evidence that the tug and barge were both in fault for failing to exercise ordinary care in making the turn, in view of the known effect of the tide; that the schooner was also in fault for anchoring without necessity where she was likely to be an obstruction to other vessels navigating the channel, in violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), and also for failing to keep an anchor watch.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by Sherman Hager, as master and owner of the schooner Annie Hodges, against the tug Prudence and the barge Dorothy. All three vessels held in fault, and damages divided.

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.
Howard M. Long, of Philadelphia, Pa., for respondents.

THOMPSON, District Judge. The steam tug Prudence and the barge Dorothy were attached to answer the libel of Sherman Hager, master and owner of the schooner Annie Hodges, to recover damages for injuries to the schooner caused by collision alleged to have been occasioned by the fault of the Prudence and Dorothy. The collision occurred in the Maurice river, near its mouth, on the night of June 18, 1912. The Annie Hodges, which was employed by her owner at the time as a fishing and oyster vessel, is 61½ feet long, 22 feet beam, with a draft of 5½ feet. The tug Prudence is a steam vessel

97 feet long, 20 feet beam, drawing 9½ feet, and was bound up the Maurice river for Silver Run, towing the barges Karl and Dorothy. Maurice river cove, into which Maurice river flows, is of such shallow depth outside the mouth of the river that vessels of the draft of the Prudence are not able to enter the river at low tide. The depth on the flats at low water varies from 1 to 5 feet. At the mouth of the river on the western bank is Elder Point, and on the eastern bank is Grog Island. The course of the river is a tortuous one. On entering the river the course is north, and after passing Grog Island the channel curves to an easterly and then a southeasterly direction, into what is known as Greenbank Reach. The course into the river is found by following what is known as the Mouth ranges, which are indicated at night by two lights on the north shore. Vessels ascending the river follow the Mouth ranges until they have passed the shoal water along Grog Island, then bear off about four points and then follow the course of the channel until they come into Green-bank Reach. Upon the day in question, shortly after sundown, the Annie Hodges proceeded up Maurice river and anchored on the western side of the river some distance to the east of the Mouth ranges. The anchor was dropped at a point off what is known as the Boathouse pier in water about 4½ fathoms in depth, with about 25 fathoms of anchor chain out.

While the testimony of the witnesses is conflicting as to the exact position of the Annie Hodges, I find from the evidence that her anchor was dropped at a point somewhat over 200 feet eastward of the Mouth ranges, and that when the flood tide was running, taking into account the length of the anchor chain, the schooner lay about 200 feet off shore, with her bow about 330 feet above the ranges heading down stream. A white anchor light was properly placed in the rigging of the vessel. About 9:30 o'clock p. m., while the tide was half flood, affording sufficient depth for the Prudence with her tow to cross the bar in Maurice river cove, she proceeded up the river following the ranges. The anchor lights of the Annie Hodges and of another schooner lying west of the ranges were observed by the master of the Prudence while a mile away, and, after following the ranges to what he considered a proper point to avoid the shoals on the Grog Island side, he bore to the northeast, and the tug passed the Hodges in safety at a distance of from 150 to 200 feet. The Karl and Dorothy were each about 200 feet in length. The Karl was being towed upon a hawser about 100 feet long, and the hawser between the Karl and the Dorothy 30 feet in length, making the total length of the tug with her tow about 630 feet. As the Prudence turned to starboard and passed the schooner, the barges were swung by the flood tide towards the western side of the channel. The Karl passed the schooner in safety, but the Dorothy struck her bow, break-ing her bowsprit and otherwise injuring her. It is claimed on the part of the libelant that the collision was due to the fault of the Prudence in not leaving the ranges at a point further from the north shore of the river, that is, that she held the ranges so long that she was obliged to make a more abrupt turn than she otherwise

would, and, further, that having seen the light of the Hodges, the tug should have come to a stop and the barge should have loosed her hawser. The respondent's claim is that the collision was due to the negligence of the libelant in anchoring his vessel in the channel at a point close to the ranges, and where she obstructed the navigation of the river. The libelant claims that the point where the Hodges was anchored was a customary anchorage ground for oyster vessels, and that the Hodges was anchored where she had a right to be. The respondents rely in part upon the act of Congress of March 3, 1899 (U. S. Compiled Statutes 1901, p. 3543, 30 Stat. at L. 152, § 15), providing that it shall be unlawful to tie up or anchor a vessel or other craft in a navigable channel in such manner as to prevent or obstruct the passage of any other vessel or craft.

There is very considerable evidence upon the part of masters of schooners as to the point where a vessel may, with safety, leave the ranges in order to make the turn and follow the channel to Greenbank Reach. As the draft of the tug is considerably greater than that of the fishing schooners, whose owners testified and the circumstances under which the tug was navigating are essentially different, I do not consider that testimony at all conclusive. There is also evidence of soundings made by the libelant and by the captain of the Prudence to ascertain the depth of the water in the river in the vicinity of where the Hodges lay. The soundings taken by the libelant, while they indicate the depth at certain angles from the position of the Hodges to have been at least 12 feet for a distance of from 700 feet or more, do not, in my opinion, sufficiently establish the fact that that depth continued along the eastern side of the river between the two points where stakes were set. The evidence on the part of the Prudence was that she was sucking bottom about the time she passed the Hodges, which, if a fact, indicates that she had taken a course as far to the eastward as it was safe for her to go.

[1] It is impossible to determine from the evidence the exact distance from the Hodges at which the Prudence could have passed her in safety, but I am convinced from the evidence that she could have been so navigated as to tow the barges past the schooner in safety if ordinary care had been exercised. Those in charge of the Prudence and the Dorothy knew that the tide was setting in towards the west bank of the river. The light of the Hodges had been observed when the tug with the barges was at sufficient distance to have either laid the course of the tug and barges so as to avoid the collision, or, knowing that the tide would carry the barges across the channel, the hawser of the Dorothy could have been loosed and the barge could have anchored until the tug could get her under control. It is a matter of such common knowledge that, where tugs are towing with long hawsers, the tow is likely to inflict injury by making a wide sweep upon a turn that the greatest degree of care is imposed upon the tugs and tows in the interest of common safety. The Hortensius (D. C.) 174 Fed. 272; The H. M. Whitney, 86 Fed. 697, 30 C. C. A. 343; The Gladiator, 79 Fed. 445, 25 C. C. A. 32.

[2] As no precautions were taken by either the tug or the barge,

they must both be held in fault for the collision. The question then is whether there was contributing fault on the part of the Hodges.

I find from the testimony that the libelant selected the anchorage place for the Hodges on the night in question as a convenient point from which to go ashore and obtain supplies; that there were no other vessels anchored east of the Mouth ranges anywhere in the vicinity of the Hodges; that on the night in question a great many sailing vessels were anchored on the reach further up the river. West of the ranges, a few hundred feet below the Hodges, another schooner was anchored, and her position was such as not to interfere with or obstruct the navigation of the channel by other vessels or craft. The evidence on the part of the libelant that the point where the Hodges lay was a customary anchorage ground for schooners is not convincing, in view of the fact that of all the vessels anchored in the river no other schooner on the night in question was anchored in that part of the river where the Hodges lay, nor is there evidence of such anchorage ground in the channel having been designated by any one in authority. The Hodges lay in 27 feet of water and it is conclusively shown by the testimony that there was ample depth of water from where she lay to the western shore. From all the evidence I cannot see how the Hodges could have been anchored for the night in a place where she was more likely to obstruct the navigation of the river by tugs towing other craft. If she had gone below the ranges, she would have been in an entirely safe position because the vessels upon leaving the ranges steered to starboard, and she would thus have been entirely out of the way of navigation. Much stress has been laid upon the testimony for libelant contradicting respondents' witnesses as to the proximity of the Hodges to the ranges, but, if the fact is as the libelant contends, it is apparent from all the circumstances that she was in such a position as to obstruct navigation more effectually than if she had been anchored directly upon the ranges at the same distance from the shore. The negligence on the part of the Prudence and Dorothy does not excuse the fault of the Hodges in lying directly in what the witnesses designate as "the best water" in a sharp bend in the channel and at a point where vessels with tows ascending the river must have ample room to make the turn. The conditions of the tide were as well known to the libelant as to those in charge of the respondents, and it would have been almost impossible for the libelant to have selected a place for anchorage at night where his vessel would be more likely to be struck. The fault of the libelant in anchoring in that position overcomes the presumption in favor of an anchored vessel when struck by a vessel in motion. The schooner was anchored in an improper place, and her owner must take the consequences which fairly result from his own act.

The circumstances clearly indicate that, while the Prudence and Dorothy could have prevented the collision, it would have been necessary, in order to safely pass the schooner, to so maneuver the tug and tow as to impose upon them difficulties of navigation, which would be unnecessary if the Hodges were not anchored in the chan-

nel. The evidence is uncontradicted that, with full knowledge of the danger of the situation, the schooner was without an anchor watch, and no attempt was made to let out additional chain, which could readily have been done if there had been the proper watch. The Sapphire, 11 Wall. 164, 20 L. Ed. 127.; The Clara, 102 U. S. 200, 26 L. Ed. 145; The Clarita, 23 Wall. 1, 23 L. Ed. 146.

The libelant must therefore be held partly in fault for the collision and the damages sustained equally by the libelant and the respondents, one-half to be borne by the libelant and one-half by the Prudence and Dorothy.

A decree will be entered accordingly.